IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 25, 2023

## STATE OF TENNESSEE v. GREGORY RYAN WEBB

**Appeal from the Criminal Court for Cumberland County**
**No. CU-22-CR-130    Gary McKenzie, Judge**

_____

### No. E2023-00464-CCA-R3-CD

_____

A Cumberland County jury convicted Defendant, Gregory Ryan Webb, of one count of domestic assault, a Class A misdemeanor, and the trial court sentenced him to eleven months, twenty-nine days in the county jail at seventy-five percent service.  On appeal, Defendant argues: (1) the trial court erred by denying his pretrial motion to dismiss based on the State's failure to preserve body camera footage from the crime scene; (2) there was insufficient evidence to support his conviction; and (3) his sentence was excessive.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TOM GREENHOLTZ, JJ., joined.

Jeffrey A. Vires, Crossville, Tennessee (on appeal); Craig P. Fickling, District Public Defender, and Lori R. Dowell, Assistant District Public Defender (at trial) for the appellant, Gregory Ryan Webb.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip Hatch and Jolie Uzelac, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

I. Procedural History

A. January 17, 2023 Motion Hearing

On September 19, 2022, the Cumberland County Grand Jury indicted Defendant on one count of domestic assault against the victim in this case, Defendant's then-wife, Leona

Webb ("the victim"). On November 22, 2022, Defendant filed a motion to dismiss based on *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), arguing the indictment should be dismissed based on the State's failure to preserve body camera footage of conversations between the responding officer, Defendant, and the victim.

At the January 17, 2023 hearing on Defendant's motion, Deputy Leviticus Gilliam with the Cumberland County Sheriff's Office testified that he was the first officer to arrive at the residence on June 4, 2021. On that day, Deputy Gilliam was equipped with a body camera provided by the Sheriff's Office. During his interaction with Defendant and the victim, the deputy's body camera was turned on and operational, capturing his conversations with the two. The victim told Deputy Gilliam that she and Defendant were arguing in the laundry room when Defendant pushed her down multiple times, leaving marks on the right side of her face and the bottom of her chin. According to Defendant, he only put his hands out to keep the victim away from him.

After speaking with Defendant and the victim, Deputy Gilliam photographed the victim's injuries and the laundry room. He then summarized Defendant's and the victim's statements into a written report. Following standard sheriff's office procedure, before Deputy Gilliam's shift ended on June 5, 2021, he uploaded his body camera footage to Blue Line Innovations ("Blue Line"), the company which at the time of the incident provided the body cameras worn by Cumberland County Sheriff's deputies and maintained the server on which footage from those cameras was stored. Deputy Gilliam testified that he had the opportunity to listen to the order of protection hearing as well as the preliminary hearing audio, and the substance of Defendant's and the victim's statements were the same as what he recalled and memorialized in his report on June 4, 2021.

Jerry Jackson, Chief Deputy of the Cumberland County Sheriff's Office, testified that he was responsible for managing body camera footage and providing it to the District Attorney General's Office. Chief Deputy Jackson stated that the Sheriff's Office had purchased body cameras from Blue Line Innovations, and as part of the purchase agreement, Blue Line agreed to store the body camera footage. When asked who was responsible for preserving evidence, Chief Deputy Jackson stated, "Generally, it would be the [S]heriff's [O]ffice, I would say."

Beginning in June 2022, Chief Deputy Jackson was unable to view, download, or even log in to Blue Line's website. He then contacted the District Attorney General's Office, which asked him to draft a letter notifying defense counsel of the issue. During that time, Chief Deputy Jackson continued to try to download the footage and contact the company. In September 2022, he was able to download and make copies of some body camera footage, but he could not access the body camera footage for the present case even after multiple attempts. In November 2022, Blue Line notified the Sheriff's Office that

effective December 31, 2022, the company was "ceasing all body cam footage . . . and their Fortify system," which stored the body camera footage. At the time of Chief Deputy Jackson's testimony, the Sheriff's Office had no business relations with Blue Line Innovations.

The trial court then analyzed the *Ferguson* factors and noted that the State "had a duty to preserve the body camera footage," but the court ultimately denied the motion because "the degree of negligence" in losing access to the footage was "slight," and the footage was "not very significant" considering other available evidence. The court also declined to provide a negative inference jury instruction because the missing evidence was not necessary for a fundamentally fair trial.

## B. Trial

The case proceeded to a jury trial on February 16, 2023. The victim testified that she and Defendant were married for seventeen years and had one child before they divorced prior to trial. During the marriage, the pair had separated for a time, and the victim had dated John Tyler during this separation. On June 4, 2021, the day of this incident, the victim and Mr. Tyler were no longer dating. The victim and Defendant were still married at the time; the victim testified she and Defendant reconciled because they shared a child. The victim acknowledged that she had dated other persons during the marriage and Defendant was upset about the victim's extramarital affairs.

On the day of the incident, the victim was taking her mother to the hospital when Defendant texted her that he was texting back and forth with Mr. Tyler. When the victim and her mother returned to the victim's mother's house, Defendant was already present. The victim told Defendant she did not want to argue in front of her mother, so Defendant and the victim went separately to their house. When the victim arrived at their home, she found Defendant sitting at his desk, looking at Mr. Tyler's mother's social media profile. Defendant demanded to know where Mr. Tyler was, and when the victim stated that she did not know, Defendant responded, "Well, then I'm going to get to his mom. If I can't get to him, I will kill his mother." The victim believed Defendant's threat to "get" Mr. Tyler meant Defendant wanted to kill him as well. The victim became upset and told Defendant she was going back to her mother's house because she did not want to argue with him.

The victim then went to the laundry room to retrieve her clothes. After she entered the laundry room, Defendant began yelling at her, "I know you're going to go see him, you wh***, you b****." The victim did not contact the police at that point but instead responded, "I just want to leave. I'm not going to fight with you." She stated that when

she turned around, Defendant, who was blocking the exit door, "grabbed me, like, shook me, and started calling me a wh*** and a b****. And then the next thing I knew, he had slung me all the way across the laundry room." When she tried to get up, Defendant pushed her "with all his force," and stated, "Get back down, b****." The victim then recalled that Defendant "put[] his fist up, like a boxer," and said, "'Get up, b****. Come on, get up. Get up.'" The victim stated that after Defendant walked out of the laundry room, "[she] didn't know if he was going to get a knife, or weapon," so she went to their bedroom located around the corner from the laundry room, found her phone, and dialed 9-1-1. She stated after she called 9-1-1, Defendant left the house, but he later returned and spoke with the responding officers.

The victim recalled Defendant picking her up and throwing her against the laundry room wall three times. At that time, the laundry room was being remodeled and there were "nails sticking out everywhere in the room." When the victim was asked what injuries she sustained, she stated, "I know my head, I had a big knot, you know, where my head hit the wall." The victim claimed she "hit a nail, but it didn't go like all the way in." Photographs taken during the victim's on-the-scene interview with police were introduced into evidence at trial; these photographs depicted two scratches on the victim's face. She testified that she did not realize she had received scratches or was bleeding until the officers told her, and she did not seek medical attention for her injuries. The victim acknowledged that Defendant did not hit, kick, or punch her during the incident—he only shoved her.

The victim testified that after Defendant bonded out of jail following his arrest for this incident, he "broke in[to] the house, and I woke up, and he was standing over me." She acknowledged that she approved of dismissing the no-contact order that had been a condition of Defendant's bond, but she claimed she did so because she "started feeling sorry for" Defendant, whom she called "a good manipulator."

Deputy Gilliam testified as a defense witness at trial. His testimony was consistent with his testimony at the motion hearing on January 17, 2023. He testified that when he arrived at the home Defendant and the victim shared, the victim appeared visibly upset because she was shaking, but she was not crying. The deputy added that he could not recall whether the victim disclosed having a knot on her head, and after reviewing his police report, he stated that he did report her having a knot on her head. Nor did he recall the victim saying that she had hit an exposed nail when Defendant shoved her. The deputy did recall that the victim told him there was debris on the floor in the laundry room, and there was a "wicker basket that fell over when she got pushed down." He noted that she did not mention being with her mother that day, arguing with Defendant about her ex-boyfriend, being called a wh*** and a b****, or that Defendant challenged her with his fists. If she had mentioned these things, Deputy Gilliam said he would have included them in his police report. Deputy Gilliam stated that the victim did not tell him that she was bleeding, but he

- 4 -

observed marks on her face with "a little bit" of blood. The deputy did not obtain medical attention for the victim because "[s]he didn't want it."

Defendant elected not to testify. After deliberating, the jury found Defendant guilty of one count of domestic assault, as charged in the indictment. Following a subsequent sentencing hearing, the trial court sentenced Defendant to eleven months, twenty-nine days in the county jail. This appeal followed.

## II. Analysis

### A. *Ferguson* Claim

Defendant argues the trial court erred in failing to dismiss the case based upon the State's failure to preserve footage from Deputy Gilliam's body camera. The State responds that the trial court properly denied the *Ferguson* motion because Defendant's fair trial rights were not denied despite the missing body camera footage. We agree with the State.

In *State v. Ferguson*, the Tennessee Supreme Court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)). Our supreme court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *Merriman*, 410 S.W.3d at 784-85. "[F]undamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

Under this "balancing approach," the trial court must first "determine whether the State had a duty to preserve the evidence." *Merriman*, 410 S.W.3d at 785. The State's duty to preserve is "limited to constitutionally material evidence." *Id.* To be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

(1) the degree of negligence involved;

(2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

(3) the sufficiency of the other evidence used at trial to support the conviction.

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *See id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

At the pretrial hearing, the trial court concluded that the State had a duty to preserve the body camera footage, and the State's inability to access the footage violated this duty.[1] As the State notes in its brief, on appeal neither party "disputes the trial court's finding[s.]" Thus, this court will not disturb the trial court's findings, and resolution of the case will turn on application of the three *Ferguson* factors.

The first factor is the degree of negligence involved; i.e., whether the conduct was simple negligence, as distinguished from gross negligence. *Ferguson*, 2 S.W.3d at 918. There is nothing in the record to suggest that the State purposefully failed to produce the body camera footage or that it acted with gross negligence. Deputy Gilliam followed the proper procedure when uploading the footage to the Blue Line server, and Chief Deputy Jackson spent months trying to recover footage not only pertaining to this case, but also footage for other cases. Once the District Attorney General became aware of the situation, it instructed the Cumberland County Sheriff's Office to notify defense counsel of the issue,

---

[1] To provide a full *Ferguson* analysis, the trial court assumed that the video could contain potentially exculpatory evidence. No party challenges this assumption, and the issue in this appeal relates only to the remedy, if any, that should have been ordered. As we discuss later, however, the record provides no evidence that anything in the body camera footage would have been exculpatory."

and Chief Deputy Jackson did so. At the pretrial hearing, the trial court found that "the degree of negligence" associated with the lost evidence was "slight" because "the officers did everything they were supposed to do in trying to upload the footage" and the Sheriff's Office likely could not have anticipated the technological issues which prevented the office from downloading the footage from Blue Line's server. We concur with the trial court's findings and conclude that the slight degree of negligence involved here did not weigh in favor of dismissing the indictment.

The second *Ferguson* factor is the significance of the missing evidence. *Id.* Here, the missing evidence is the body camera footage of the victim and Defendant speaking to officers after the incident. The footage was the involved parties' recitation of the facts to officers, as opposed to a recording of the altercation. While such evidence would have been beneficial, the absence of the recording was not fatal to Defendant's fair trial rights, as other evidence regarding the incident was still available. First, the victim testified, during the pretrial hearing and trial, and her testimony was the evidence as to what happened. Deputy Gilliam also testified. Defense counsel was able to cross-examine these witnesses to impeach them, and the deputy's report he made on the same day of the incident was available for defense counsel to use to impeach the witnesses when their testimony strayed from the earlier report. There was also physical evidence. Deputy Gilliam photographed the victim's injuries as well as the laundry room where the incident occurred. The photographs were introduced into evidence at trial, so the jury was able to view the victim's injuries even without the missing body camera footage.

As the trial court observed, unlike a missing video showing the actual offense,[2] the missing footage from Deputy Gilliam's body camera would have only provided the involved parties' after-the-fact recitations of what they perceived during the incident. The jury was able to glean such information from the victim's and Deputy Gilliam's testimony. Thus, the significance of the lost body camera footage was slight and did not weigh in favor of dismissing the indictment.

The final *Ferguson* factor is the sufficiency of the convicting evidence. Importantly, there is no proof that anything on the tape was exculpatory. The remaining evidence presented at trial included the officer's testimony, the victim's testimony, and the photographs of the victim's injuries. As examined in greater detail below, this evidence, even absent the body camera footage, was sufficient for the jury to find beyond a reasonable doubt that Defendant committed the offense of domestic assault. Despite the unavailability of the body camera footage, Defendant was able to fully present his defense even without the evidence.

---

[2] *See, e.g.*, *Merriman*, 410 S.W.3d at 793 (missing police video was significant because it "was the only non-testimonial evidence" of Merriman's supposed driving while intoxicated).

Under the facts and circumstances of this case, we conclude Defendant received a fundamentally fair trial and that he experienced no measurable disadvantage because of the missing body camera footage. The trial court therefore did not abuse its discretion in denying Defendant's *Ferguson* motion. He is not entitled to relief on this issue.

## B. Sufficiency of Evidence

Defendant argues "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]" The State contends the essential elements of assault were found beyond a reasonable doubt based on the testimonial and physical evidence.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence, circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Under Tennessee law, a person commits domestic assault by (1) intentionally, knowingly, or recklessly causing bodily injury to a (2) "domestic abuse victim," which includes current or former spouses. Tenn. Code Ann. §§ 39-13-111, -101.

In this case, it is undisputed that Defendant and the victim were married at the time of the incident. Defendant contends, however, "the lack of a body cam[era] video resulted in the State relying solely on the testimony of the victim and Deputy Gilliam," and there was a "variance between the testimony of the State's [sic] two witnesses" which resulted in inconsistent testimony. Defendant provides no specifics to support his contention that the testimony was inconsistent, and therefore has not satisfied his burden of "'showing that the evidence was legally insufficient to sustain [the] guilty verdict.'" *Davis*, 354 S.W.3d at 729 (quoting *Sisk*, 343 S.W.3d at 65). In any event, Defendant once again fails to acknowledge the photographic evidence of the victim's injuries. Additionally, Deputy Gilliam's observations and the victim's testimony reasonably support the inference that Defendant threw the victim against a wall three times, causing her bodily injury.

As the State notes in its brief, "the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses." *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (quoting *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966)). *See also State v. Givens*, No. W2019-01799-CCA-R3-CD, 2021 WL 1546072, at *4 (Tenn. Crim. App. Apr. 20, 2021) ("When there is a discrepancy between two witnesses' testimonies, 'the weight and credibility of [the] testimony of a witness, and the reconciliation of conflicts in testimony, are matters entrusted exclusively to the jury as the triers of fact.'" (quoting *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978))), *no perm. app. filed*. "A jury verdict approved by the trial judge credits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory." *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992) (citations omitted). Here, the victim told the jury what happened. The jury and the trial judge credited her testimony, and we will not reweigh this evidence. Therefore, Defendant is not entitled to relief on this issue.

### C. Sentencing

Defendant contends his sentence was excessive because his prior convictions "did not involve the infliction of bodily harm," "the victim did not seek medical treatment following the assault," and because he has "mental health issues." The State argues that the sentence should be affirmed because the trial court imposed a within-range sentence that complies with the purposes and principles of sentencing. We agree with the State.

### 1. Sentencing Hearing

At the sentencing hearing on March 20, 2023, the State introduced a presentence report which revealed that Defendant had twelve prior felony convictions, five of which were convictions for aggravated burglary. The victim in this case testified at the hearing, asking the trial court to impose the maximum sentence. She acknowledged that in the

presentence report, she suggested that Defendant also receive mental health counseling. She also acknowledged, as she had at trial, that she did not seek medical treatment after this incident. Defendant attempted to offer an allocution, but he used his statement to emphasize that he had never been convicted for a violent offense before and that his wife had, allegedly, made several assault claims against him previously. He also claimed that the victim was attempting to take his home from him through the court system. This prompted the trial court to stop Defendant's allocution.

In imposing Defendant's sentence, the trial court began by considering "[t]he principles of sentencing and arguments to alternatives that have been argued here today. The characteristics of the criminal conduct, and the nature of the criminal conduct." The court continued:

> Mitigating and enhancement factors, again, aren't really relevant in this scenario, because we're not moving a sentence within a range. Statements that the defendant has made, he made an allocution, for whatever weight you can attach to an unsworn statement, I'll consider that. There's no risk needs assessment, as it's not a felony level offense. And the statistical analysis that the AOC [Administrative Office of the Courts] provides are mostly felony level offenses. There's not much to consider there.

> Considering Defendant's prior convictions, the trial court stated:
> It is numerous, numerous amounts of felonies, and it's the type of felony criminal history that would make, it would make this defendant a career offender [if sentenced for a felony conviction]. I mean, these are, most people go their whole life without a single felony conviction, and here we have, one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, I think, total felonies.

Accordingly, the trial court imposed a sentence of eleven months, twenty-nine days, the maximum sentence for a person convicted of a Class A misdemeanor. *See* Tenn. Code Ann. §§ 40-35-110, -111(e)(1).

## 2. Standard of Review

Our supreme court has recognized that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Domestic assault is a Class A misdemeanor, carrying a maximum sentence of eleven months and twenty-nine days' imprisonment. As this court recently recognized, "[O]ur supreme court has not specifically considered whether the *Bise* standard of review applies to misdemeanor sentencing determinations[.]" *State v. Jones*, No. W2022-01270-CCA-R3-CD, 2023 WL 3451553, at *2 (Tenn. Crim. App. May 2, 2023), *perm. app. denied* (Tenn. Aug. 9, 2023). Our supreme court has, however, stated that "the abuse of discretion standard of appellate review accompanied by a presumption of reasonableness applies to all sentencing decisions." *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014) (citing *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013)). Specifically, our supreme court has stated this standard also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Accordingly, this panel will apply the *Bise* standard to its review of Defendant's sentence.[3]

A sentence imposed for a misdemeanor offense must be specific and in accordance with the principles, purposes, and goals of the Sentencing Act. Tenn. Code Ann. §§ 40-35-104, -302(b); *State v. Cooper*, 336 S.W.3d 522, 524 (Tenn. 2011) (per curiam); *State v. Palmer*, 902 S.W.2d 391, 394 (Tenn. 1995). For misdemeanor sentences, the trial court designates "a percentage of that sentence, which the offender must serve before becoming eligible for consideration [of] rehabilitative programs," usually not to exceed seventy-five percent. *Palmer*, 902 S.W.2d at 394; *see* Tenn. Code Ann. § 40-35-302(d). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103.

"Ultimately, in sentencing a defendant, a trial court should impose a sentence that is 'no greater than that deserved for the offense committed' and is 'the least severe measure necessary to achieve the purposes for which the sentence is imposed.'" *Jones*, 2023 WL 3451553, at *3 (quoting Tenn. Code Ann. §§ 40-35-103(2), (4)). However, a person convicted of a misdemeanor offense has no presumption of entitlement to a minimum sentence. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citations omitted). Furthermore, "a trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998).

---

[3] Other panels of this court have also applied *Bise* in reviewing misdemeanor sentencing. *See State v. Kirk*, No. M2022-01334-CCA-R3-CD, 2023 WL 4948887, at *4 (Tenn. Crim. App. Aug. 3, 2023), *no perm. app. filed; State v. Crode*, No. M2021-01371-CCA-R3-CD, 2023 WL 3736157, at *6 (Tenn. Crim. App. May 31, 2023), *no perm. app. filed*; *Jones*, 2023 WL 3451553, at *2; *State v. Hampton*, No. W2018-00623-CCA-R3-CD, 2019 WL 1167807, at *12 (Tenn. Crim. App. Mar. 12, 2019) (citing to four other cases from this court applying *Bise* to misdemeanor sentencing).

In sum, "the trial court has more flexibility in misdemeanor sentencing than in felony sentencing." *Johnson*, 15 S.W.3d at 518.

Here, the trial court imposed a within-range sentence after considering the evidence offered at trial and the sentencing hearing, a presentence report prepared by a private probation company, the principles of sentencing, the parties' arguments, the nature and characteristics of the crime, and evidence of mitigating and enhancement factors. Tenn. Code Ann. §§ 40-35- 103(5), -114, There is nothing in the record to suggest the trial court abused its discretion in imposing the maximum sentence of eleven months, twenty-nine days, particularly given Defendant's lengthy criminal history, or, given the applicable enhancement and mitigating factors, in ordering that the sentence be served at seventy-five percent. Subsequently, Defendant cannot overcome the presumption of reasonableness that this court affords to the trial court's decision. He is not entitled to relief on this issue.

III. Conclusion

The judgment of the trial court is affirmed.

_____
MATTHEW J. WILSON, JUDGE