IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 21, 2024

**STATE OF TENNESSEE v. KIRK D. FARMER**

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2020-CR-153    David D. Wolfe, Judge**

_____

**No. M2023-00522-CCA-R3-CD**

_____

After a Dickson County jury trial, Defendant, Kirk D. Farmer, was convicted of vandalism of $2,500 or more but less than $10,000 and disorderly conduct.  The trial court sentenced him to an effective term of three years in the Tennessee Department of Correction.  On appeal, Defendant argues the evidence produced at trial was insufficient to sustain his vandalism conviction.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TOM GREENHOLTZ, JJ., joined.

Mitchell A. Raines, Assistant Public Defender—Appellate Division (on appeal); Matthew Mitchell, District Public Defender; and Mitch Dugan, Assistant District Public Defender (at trial), for the appellant, Kirk D. Farmer.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Danielle Bryson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Trial

On July 30, 2019, Defendant, Kirk D. Farmer, vandalized a Dickson County Wendy's restaurant with a mallet.  Three on-duty employees and another employee whose shift had not started were present.  The Dickson County Grand Jury indicted Defendant on three counts of reckless aggravated assault and one count each of vandalism valued at

$2,500 or more but less than $10,000, public intoxication, and disorderly conduct. The case proceeded to a jury trial held on March 28, 2022.

Jennifer Richey testified she was the store manager at the Wendy's located on Highway 46 in Dickson the day of the incident. On that day, she and two other workers, Adriana Guellen and Veronica Ortega, opened the store. Another worker, Brett Richey, whom Ms. Richey identified as her "significant other," was present at the store, although his shift did not begin until later that day. Ms. Richey explained Mr. Richey was "in and out" of the restaurant the morning of the incident.

The restaurant opened at 9:00 a.m., and Defendant entered as it opened. Ms. Richey testified that Defendant was a regular customer who usually arrived as the restaurant opened. Ms. Richey, who was working the register at the front of the restaurant, took Defendant's order; the other two on-duty employees were working in the back of the restaurant. Ms. Richey told Defendant that because the restaurant had just opened, it would take some time to prepare his order. She said Defendant was "fine" with this news, and he headed to the restroom. When Defendant emerged from the restroom, Ms. Richey gave Defendant the food he had ordered.

After Defendant exited the restroom, Mr. Richey went to the restroom. Ms. Richey testified that when Mr. Richey exited the restroom, "He alerted me to an empty liquor bottle, razor caps, and just like, I don't even know how to explain, like a bunch of like debris type like dirtiness in our sink." Ms. Richey went to the bathroom and saw the scene as Mr. Richey had described it. Ms. Richey testified that customers had complained previously about "beard shavings and liquor bottles" being in the restroom, so after discovering the scene in the restroom she went into the employee area and called her general manager. Ms. Richey told the manager that she would "let [Defendant] know . . . that would not be tolerated at our unit, at our store."

Ms. Richey then went to Defendant's table and explained that "if he continued his actions of using our bathroom as a personal restroom that he would no longer be allowed to sit at Wendy's." Ms. Richey testified that Defendant then became "[v]ery argumentative," repeatedly denying that he had done anything wrong. Ms. Richey asked Defendant if he understood that "if he continued that he was not going to be allowed to sit at [the] store," after which point Defendant said he was not leaving. Ms. Richey added, "After five minutes of going back and forth probably, I told him that I was not going to tolerate it anymore, that I was just going to give him his money back and he was going to go." Ms. Richey informed Defendant that the police would be called if he did not leave, and when he did not leave as instructed, she went into the restaurant's employee area to call the police.

- 2 -

Ms. Richey called the Dickson Police Department's non-emergency number and asked for "assistance in removing a customer who refused to leave." The dispatcher asked Ms. Richey if it was an emergency; Ms. Richey responded it was not. Ms. Richey testified that at this point in the phone call, it was quiet in the restaurant, and nobody other than the aforementioned persons were present. However, while Ms. Richey was on the phone with the police dispatcher, she looked to the front of the restaurant to see Defendant "smashing everything on our counter. And I immediately told the [dispatcher] that this has now gone from non-emergency to 911, I need somebody now."

Specifically, Ms. Richey testified, Defendant grabbed a "rubber ended mallet" to smash the restaurant's "cash register, our credit card machines, our cookie display, our ketchup pumps. Any and everything that he could get to." During this time, Ms. Richey's focus was to prevent Defendant from entering the employee area at the rear of the restaurant, so she locked the door leading to that area.

Ms. Richey testified the single damaged cash register was valued at $2,800; the two damaged credit card machines were valued at $500 each; the damaged cookie display was valued at $300; the two damaged receipt printers were valued at $300 each; and the two ketchup pumps were valued at $150 each.

Ms. Richey was unable to smell the odor of an alcoholic beverage on Defendant, but in her opinion "he acted as if something was not right. Like he was not of [a] sober mind frame[.]" She had interacted with Defendant often before this incident and never encountered problems. She denied that Defendant swung the mallet at her, adding that she did not get close enough to Defendant for him to do so. She also denied that Defendant approached the two employees working in the back of the restaurant during the incident.

Mr. Richey testified that when he went into the men's restroom after the Defendant the morning of the incident, he found a liquor bottle and shaving razor. Mr. Richey said that he and Defendant were the only two persons who could have placed those items in the restroom that morning, and that he did not place the items there. After Mr. Richey found the items in the restroom, he notified Ms. Richey of his findings and went outside the restaurant. Mr. Richey returned when he heard Ms. Richey "yell[ing] out the window that [Defendant] was inside destroying everything." Mr. Richey said he approached Defendant and asked him, "why are you doing this[?]" At one point, Defendant placed a chair on a dining room table; Mr. Richey said that Defendant did not say anything after he did this, but "[h]e just stood there with a big smile on his face." Mr. Richey denied asking Defendant to break the chair and denied asking Defendant to do anything while he was in the store with Defendant.

Testifying through an interpreter, Adriana Guellen[1] recalled that Defendant visited the restaurant frequently, as often as five times per week, and that he occasionally helped pick up garbage around the restaurant. Ms. Guellen testified that Ms. Richey did not like Defendant being at the restaurant so often, but Ms. Guellen did not know whether Ms. Richey wanted Defendant to stop visiting the restaurant before the incident occurred. The morning of the incident, Ms. Guellen testified, Defendant started off calm, but she soon saw Defendant "destroy[ing] everything in Wendy's. The cash registers, the ketchup containers, and the place where we would put the crackers." Ms. Guellen said she was concerned for her safety during the incident. She said that when Defendant first started smashing things, she thought she would be able to "talk to him to calm him down." Ms. Guellen changed her mind when Ms. Richey "yelled at me and told me that he had a weapon," which Ms. Guellen thought could be a pistol. Ms. Guellen testified nobody had given Defendant permission to smash things in the restaurant.

Veronica Ortega, who also testified through an interpreter, testified that she and Ms. Guellen were working in the back of the restaurant the morning of the incident when they heard a commotion. Ms. Ortega said she and Ms. Guellen went toward the front of the restaurant and saw Defendant "destroying things" with a mallet. Ms. Ortega was scared during the incident and, like her colleagues, denied that anyone gave Defendant permission to break things inside the restaurant. Like Ms. Guellen, Ms. Ortega testified Defendant had, before this incident, occasionally helped pick up trash around the restaurant. Ms. Ortega said that while the Wendy's general manager had no problem with Defendant being at the restaurant so often, Ms. Richey had wanted Defendant to leave before this incident.

The State recalled Ms. Richey after the other Wendy's employees testified. She denied that she wanted Defendant to break anything in the restaurant or gave Defendant permission to break anything. Ms. Richey denied that, before this incident, she had wanted Defendant put out of the restaurant. When asked whether she liked Defendant sitting in the restaurant all day, Ms. Richey replied, "My like has nothing to do with my job. No, it doesn't matter." She denied asking the general manager to have Defendant banned from the restaurant, but Ms. Richey did tell the general manager about "the liabilities that we had if someone was to cut their hand on that trash can, if a kid stuck their hand in there to get a toy."

Officer Luke Daniel with the Dickson Police Department responded to the 911 call the day of the incident. Upon arriving at Wendy's, he saw Ms. Richey "running frantically" outside the restaurant. The officer entered the restaurant and drew his taser, pointing at Defendant, who was the only customer in the restaurant. Defendant surrendered and was

---

[1] Ms. Guellen is also listed in the transcript as "Adriana Perez." However, when asked to provide her name, the witness stated her last name was "Guellen." We will use that name in this opinion.

arrested. The officer collected a mallet that was broken in two pieces and a knife, which Defendant removed from his pocket when he placed himself on the ground in front of the officer. The officer acknowledged that Defendant complied with his orders and did not fight the officer.

Defendant testified on his own behalf. He recalled entering the restaurant around 8:45 the morning of July 30, ordering his food, and going to the restroom. When he left the restroom and returned to the front counter, he saw that a coffee cup was missing. He claimed Ms. Richey told him, "you traded it." He claimed he sat down at a table to eat and was then confronted by Ms. Richey about the restroom. Defendant claimed he did not damage the restroom that morning.

Defendant testified that at some point that morning, he picked up a mallet that looked like one he owned but which was not his. He claimed that Ms. Richey told him that "if you do something that I tell you to do I won't call the cops." Defendant was upset but said he tried "to be as cool as I can be about things." He claimed that in response to Ms. Richey's "barking orders" at him, he "[h]it this, smack[ed] that. Cut open the bags, thr[e]w this over here. For some reason I just started doing that." When asked by his attorney if he wanted to add anything to his testimony, Defendant stated,

> Well, I don't know if anybody has ever been upset, but sometimes even years with somebody aggravating you just, you know, a little bit, needling you, poking at you, talking about this, talking about that behind your back, you know, or even behind the counter while you are sitting in the dining room. It actually bums out. And that's the assault that she assaulted me with. That's the things that just kept building up to do what I did.

Defendant testified that he did not intend to hurt Ms. Richey or anyone else at the restaurant that morning. Rather, he "want[ed] to show that you are bothering me, and it actually started to hurt."

Three video recordings of Defendant's actions, taken from different vantage points inside the restaurant, were introduced as exhibits; the videos did not record audio of the incident. The videos show Defendant emerging from the restroom, retrieving his order, and going to his seat near the rear of the dining room. After Defendant ate for about four minutes, Ms. Richey approaches Defendant's table. The apparent conversation between the two lasts approximately ninety seconds; Ms. Richey makes some hand gestures but Defendant does not appear agitated during the conversation. The video then shows Ms. Richey going to the employee food preparation and office area out of view of the dining room. Over the next five to six minutes she is seen in the food preparation area speaking on the telephone and talking to other employees. About six minutes after Defendant's

conversation with Ms. Richey ends, the video shows Defendant grabbing a mallet from his backpack, which was at his table. He then walks to the service counter and bashes equipment and food displays with the mallet. When Defendant's attack at the front counter begins, Ms. Richey is seen emerging from out of view while using the telephone. The videos show Ms. Richey looking around the corner and speaking to Defendant briefly from behind the counter, but during the attack she mostly stays on the telephone in a portion of the food preparation area out of view of the dining room. Defendant is then seen leaving the counter area, walking to a side wall of the restaurant, cutting open bags of ketchup attached to the pumps, throwing the ketchup about the restaurant, and breaking the ketchup pumps. Mr. Richey is then seen entering the restaurant through an entrance near the back of the dining room and speaking to Defendant briefly; Defendant responds by placing a chair atop a table. Defendant is then seen walking back to his table and taking a drink from a bottle before a police officer enters the restaurant with his taser drawn. Defendant is then seen surrendering without incident. Approximately three minutes elapsed between Defendant's grabbing the mallet from his bag and his surrender to police. Photographs of the restaurant taken after the incident were also introduced, depicting damage consistent with that described by the witnesses and shown in the videos.

At the close of the State's proof, the trial court granted in part Defendant's motion for judgment of acquittal on the reckless aggravated assault counts; for those three counts, the court charged the jury only on the lesser included offense of reckless endangerment. The jury found Defendant guilty as charged of vandalism and disorderly conduct[2] and found him not guilty of the three counts of reckless endangerment and one count of public intoxication. After a sentencing hearing, the trial court imposed an effective sentence of three years in the Tennessee Department of Correction. This appeal followed.

## II. Analysis

Defendant contends the evidence produced at trial was insufficient for the jury to find him guilty of vandalism beyond a reasonable doubt. We disagree.

## A. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction

---

[2] Defendant does not challenge his disorderly conduct conviction or his sentence on appeal.

relies on direct evidence, circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## B. Vandalism

As charged in the indictment, a defendant commits vandalism when the defendant knowingly "[c]auses damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent[.]" Tenn. Code Ann. § 39-14-408(b)(1). "Effective consent" is defined as "assent in fact, whether express or apparent, including assent by one legally authorized to act for another." *Id.* § 39-11-106(a)(11).

In defining "knowingly," the criminal code states that a person:

acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-302(b). "Vandalism is a result-of-conduct offense with regard to the element of causing damages. Vandalism is a nature-of-conduct offense with respect to the ownership of the property." *State v. Goldberg*, No. M2017-02215-CCA-R3-CD, 2019 WL 1304109, at *10 (Tenn. Crim. App. Mar. 20, 2019) (citation omitted)), *perm. app. denied* (Tenn. Dec. 5, 2019).

"[A] defendant's mental state is rarely subject to proof by direct evidence[.]" *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010) (citing *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000)). "[I]t is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' 'from surrounding facts and circumstances.'" *Brown*, 311 S.W.3d at 432 (first quoting *State v. Lowery*, 667 S.W.2d 52, 57 (Tenn. 1984); and then citing *Inlow*, 52 S.W.3d at 105). "Intent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act[,] and from all the circumstances of the case in evidence." *Inlow*, 52 S.W.3d at 105. "One's actions are circumstantial evidence of his intent." *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993) (internal quotation omitted).

Here, the testimony of the trial witnesses and surveillance video exhibits show that Defendant used a mallet to damage or destroy several items in the Wendy's restaurant, including a cash register, receipt printers, credit card machines, ketchup dispensers, and a cookie display. Defendant acknowledges damaging or destroying the property and does not dispute Ms. Richey's testimony regarding the value of the damage. Instead, Defendant's contentions regarding the supposed insufficiency of the convicting evidence focus on the mental state and effective consent elements of the offense. He contends the evidence did not establish that he acted "knowingly" because he had a "documented history of mental health issues" and was "upset," "not thinking straight," and "emotional," during the incident. He also contends that he acted with the owner's effective consent because he acted on Ms. Richey's instructions in damaging the Wendy's property. We disagree.

As stated above, vandalism is a result-of-conduct offense as to the element of damage; thus, to prove that Defendant acted "knowingly" as to that element, the State was required to prove beyond a reasonable doubt that Defendant was reasonably certain to cause damage or destruction to property. Regarding Defendant's assertion that he did act knowingly, Defendant did not present his alleged "documented history of mental health issues" to the jury. Defendant was ordered to undergo a pretrial forensic mental health evaluation; the report from this evaluation appears in the technical record on appeal, but the report was not introduced at trial and no mental health expert offered opinion testimony which could have supported a mental health defense. None of the testifying witnesses expressed concern about Defendant's previous actions; rather, some of the witnesses testified that Defendant, a "regular" at this Wendy's, occasionally helped clean up trash at the restaurant. Furthermore, the responding officer testified that Defendant immediately surrendered when confronted by police and readily handed over a knife he was carrying when arrested. The jury had legally sufficient evidence from which it could find the Defendant was reasonably certain that his conduct would result in the damage or destruction of Wendy's property.

Addressing Defendant's argument that he damaged the Wendy's property because Ms. Richey instructed him to do so, Defendant's claim was refuted by the testimony of Ms. Richey and the other Wendy's employees, all of whom denied Defendant had permission to vandalize the restaurant. In finding that Defendant did not have the owner's effective consent at the time of his actions—and in finding that he acted knowingly or was aware that he did not have the owner's effective consent—the jury assessed the credibility of the testifying witnesses and rejected the contentions that Defendant raises on appeal. As stated above, this court will not reassess the jury's credibility determinations or its weighing of the evidence, as such matters are entrusted to the jury as finder of fact. *See Bland*, 958 S.W.2d at 659. We therefore conclude the evidence was sufficient to establish, beyond a reasonable doubt, that Defendant knowingly acted without the owner's effective consent at the time he vandalized the Wendy's restaurant. He is not entitled to relief.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
MATTHEW J. WILSON, JUDGE