Russell Howard **KITE**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–89–00418–CR.

Court of Appeals of Texas, Houston (1st Dist.).

March 29, 1990.

Rehearing Denied May 10, 1990.

Dean J. Johnson, Michael David Peck, Houston, for appellant.

John B. Holmes, Dist. Atty., Katherine Haden, Asst. Dist. Atty., for appellee.

Before EVANS, C.J., and DUGGAN and MIRABAL, JJ.

## OPINION

MIRABAL, Justice.

An indictment charged appellant with possession of methamphetamine weighing at least 400 grams. Appellant filed a motion to suppress evidence, which was denied after a pretrial evidentiary hearing. Appellant then entered a guilty plea to the reduced charge of possession of methamphetamine weighing less than 400 grams, reserving his right to appeal the denial of his motion to suppress. Pursuant to this plea bargain agreement, the trial court deferred finding appellant guilty, placed appellant on six years probation, and ordered appellant to pay a $1,000 fine. Appellant now appeals from the trial court's adverse ruling on appellant's motion to suppress evidence.[1]

---

1. There is a lurking, significant criminal law issue in this case that needs to be discussed, namely, that the law has changed to allow a defendant on deferred adjudication to appeal. Prior to November 3, 1987, appellate courts had no jurisdiction to hear the appeal of a defendant who received deferred adjudication. *McDougal v. State,* 610 S.W.2d 509 (Tex.Crim.App.1981). On November 3, 1987, voters passed a constitutional amendment giving the State the right to appeal in criminal cases for the first time. On the same date, the present version of Tex.Code Crim.P.Ann. art. 44.01 took effect, generally stating how the State may prosecute an appeal.

There is a little noticed provision in article 44.01 that changed prior case law and, for the first time, allowed a defendant who gets deferred adjudication to appeal. Subsection (j) of article 44.01 provides: "Nothing in this article is to interfere with the defendant's right to appeal under the procedures of art. 44.02 of this code. *The defendant's right to appeal under art. 44.02 may be prosecuted by the defendant where the punishment assessed is in accordance with subsection (a) section 3d, art. 42.12 of this code, as well as any other punishment assessed in compli-*

In his first point of error, appellant contends the trial court erred in overruling appellant's motion to suppress evidence obtained as a result of a warrantless arrest for which there was no probable cause.

In his second point of error, appellant contends the trial court erred in overruling appellant's motion to suppress evidence obtained without a search warrant or valid exception to the warrant requirement; appellant argues that the evidence discovered pursuant to his illegal arrest was not admissable.

The State argues that appellant failed to preserve error on these points because appellant did not raise the same argument at trial that he raises on appeal. On appeal, appellant argues that his arrest did not fall under articles 14.01 or 14.03 of the Texas Code of Criminal Procedure. Chapter 14 of the Texas Code of Criminal Procedure provides exceptions authorizing an officer to arrest an offender without a warrant. In his motion to suppress evidence presented to the trial court, appellant argued that he was arrested without a warrant and without probable cause; that he was arrested pursuant to a pretextual stop and without probable cause; and that all of the items seized were obtained illegally in violation of appellant's rights under the fourth, fifth, sixth, and fourteenth amendments to the United States Constitution, article I, § 9 of the Texas Constitution, and article 38.23 of the Texas Code of Criminal Procedure, in that the items were seized without probable cause.

The Texas Code of Criminal Procedure provides:

A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view. Tex.Code Crim.P.Ann. art. 14.01(b) (Vernon 1977).

The Texas Code of Criminal Procedure further provides:

Any peace officer may arrest, without warrant:

persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws.

Tex.Code Crim.P.Ann. art. 14.03(a)(1) (Vernon Supp.1990).

The thrust of articles 14.01(b) and 14.03(a)(1) are that an officer may arrest an offender without a warrant when the officer has probable cause to believe that an offense is being committed in his presence, or that the person has in the past committed, or is about to commit, some offense. See Lunde v. State, 736 S.W.2d 665, 666–67 (Tex.Crim.App.1987). Appellant's arguments in his written motion that he was arrested without a warrant and without probable cause, coupled with appellant's citations to the Texas Constitution and Texas Code of Criminal Procedure, were enough to preserve review. See Eisenhauer v. State, 754 S.W.2d 159, 160–61 (Tex.Crim. App.), cert. denied, —— U.S. ——, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988) (where appellant's written motion to suppress stated he was arrested without a warrant and without probable cause in violation of several amendments to the U.S. Constitution, and in violation of the "laws and Constitution

ance with art. 44.02 of this code." (emphasis added).

The "subsection (a), sec. 3d, art. 42.12 of this code" referred to in subsection (j) is the deferred adjudication statute, as it was then codified and amended. See ch. 231, sec. 1, 1975 Tex.Gen.Laws 572. That section allowed a court to "defer further proceedings without entering an adjudication of guilt, and place the defendant on probation." Thus, we have jurisdiction to decide the merits of an appeal by a defendant on deferred adjudication.

We note that article 44.01(j) has not been changed, but article 42.12 has been amended, so that there is no longer a section 3d. The latest version of article 42.12 says that sections 3a to 3f are "blank." Instead, deferred adjudication is now provided for in section 5 of article 42.12. See ch. 785, sec. 4.17, 1989 Tex.Gen.Laws 3500–3501. We doubt that the legislature intended to grant the right of appeal when the deferred adjudication statute was numbered section "3d," but meant to abolish that right of appeal by renumbering the provision on deferred adjudication. We construe article 44.01(j) as granting a right of appeal to a defendant who receives deferred adjudication, even though the punishment assessed is in accordance with article 42.-12 section 5, instead of section 3d(a).

of the State of Texas," and where appellant's attorney only argued the federal claims at the hearing on the motion, appellant's state law claims, nevertheless, were preserved for appeal). The court in *Eisenhauer* stated:

> Though it has long been the rule that a general or imprecise specific objection is insufficient to preserve error for appeal, where the grounds of the objection are obvious to the court or the opposing counsel, the error will not be waived.

754 S.W.2d at 161.

■ The standard for reviewing a trial court's decision denying a defendant's motion to suppress evidence is that the evidence should be viewed in a light most favorable to the trial court's ruling. *See Sawyers v. State,* 724 S.W.2d 24, 35 (Tex. Crim.App.1986). Because the trial court is the sole trier of fact at a hearing on a motion to suppress, any finding supported by the record will not be disturbed. *Green v. State,* 615 S.W.2d 700, 707 (Tex.Crim. App. [Panel Op.] 1980), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981).

■ Three witnesses testified at the motion to suppress hearing. The State called the arresting officer to testify, and the defense offered the testimony of a chemist and the manager of the apartment complex where appellant was observed.

On direct, the arresting officer, Nicholas Wilson, testified as follows: Officer Wilson is an eight year veteran of the narcotics division of the Houston Police Department. On November 5, 1988 at approximately 1:30 p.m., Officer Wilson received information from an informant that a narcotics transaction would take place at apartment # 511 in an apartment complex at 2900 South Gessner. Officer Wilson had known the informant for about two years, during which time he had received accurate and reliable information from the informant on many occasions. Officer Wilson was with the informant while he had a conversation with a Diane Yarcey, but Officer Wilson did not hear what Yarcey was saying. The informant told Officer Wilson that Yarcey had just told him that a white female would deliver a large quantity of MDMA tablets within the next 20 minutes to Yarcey's apartment # 511. Another person was going to come by Yarcey's apartment to buy the tablets within 25 to 45 minutes after the woman with the tablets arrived.

After receiving the information and deciding that he did not have time to obtain a warrant, Officer Wilson went directly to Ms. Yarcey's apartment. Wilson's partner, Officer Johnny Ybarbo, came in another vehicle. The officers arrived at the apartment complex around 1:50 p.m. and set up surveillance. At approximately 2:00 p.m., they observed a white female driving a red Pontiac Fiero park *in front of apartment # 511.* The woman arrived within the time frame the informant gave. The woman exited her car carrying a tennis racket[2] and a white plastic bag, and went *inside apartment # 511.* She left the apartment within 10 to 15 minutes carrying the same plastic bag and walked back to the Fiero. She opened the trunk of the Fiero, placed the bag inside the trunk, walked back *to apartment # 511, and went inside.* When the woman first left the apartment carrying the bag back to the car, she looked around the parking lot with a "nervous type mannerism." After 10 to 15 minutes, the woman came outside a second time, opened the trunk of the Fiero, picked up the bag as if to reassure herself that the bag was still there, returned the bag to the trunk, and walked back *to apartment # 511.* About 15 to 20 minutes later, the woman came out a third time, got into the Fiero, and drove around the vicinity of the apartment complex. She drove to a convenience store located behind the apartment complex and walked up to the front of the store, but did not go inside. She then got back into her car, drove back to the apartment complex, parked about seven spaces to the west of where she was parked before, retrieved the white plastic bag from the trunk, and once again *went inside apartment # 511,* this time carrying the bag. Officer Wilson testified that it ap-

---

**2.** The apartment complex has two tennis courts.

peared to him she was making a "heat run"—making sure no one was following her. Officer Wilson and his partner followed the Fiero during the "heat run," which took them away from their surveillance spots for about 10 minutes.

In the next 10 to 15 minutes after the Fiero and the officers had returned, appellant drove up in a blue pickup truck and parked in the vicinity of the building where apartment 511 is located. He exited the truck carrying a blue bag, which looked like a shaving kit, and walked *directly to apartment #511*. The bag appeared to be only partially filled. Appellant stayed *inside apartment #511* for about five minutes; *"we observed him walk out of Apartment 511."* He exited the apartment carrying the same blue bag, except this time the bag was "excessively full ... actually bulging." Appellant walked to his truck, pushed aside a spare tire resting in the bed of the truck, and instead of returning the bag to the cab of the truck, he wedged the bag between the tire and side wall of the truck.[3] Appellant then entered the cab of his truck and drove off. Officer Wilson and his partner followed appellant for approximately three miles before they pulled him over. They identified themselves as police officers and placed appellant under arrest. After placing appellant under arrest, Officer Wilson retrieved the blue bag and looked inside it, finding a large quantity of white MDMA tablets.

On cross-examination, Officer Wilson testified as follows:

Q: [By Defense Counsel]: Did you have a clear view of Apartment 511?

A. [By Officer Wilson]: Yes, sir.

. . . .

Q: [By Defense Counsel]: Did you see how the white female entered the apartment, Officer Wilson?

A. [By Officer Wilson]: No, sir.

Q. You can't say whether she had a key to the door?

A. No, sir, I can't.

Q. And you couldn't say whether she knocked and someone opened it?

A. No, sir, I couldn't.

Q. You couldn't state whether the door was open; is that correct?

A. That's correct.

Q. Could you see the front door of the apartment?

A. From my surveillance, no, sir.

. . . .

Q: [By Defense Counsel]: How long were you in the parking garage on the second level?

A. [By Officer Wilson]: I was there when Mr. Kite arrived, but I wasn't at that position when the Fiero first arrived.

Q. So when the red Fiero showed up, where were you?

A. When the red Fiero arrived at the location, I was parked in the apartment complex itself.

. . . .

Q: [By Defense Counsel]: So it's your testimony, then, Officer Wilson, that you don't recall where you were specifically in that parking lot at any time that the white female either entered or exited the apartment; is that correct?

A. [By Officer Wilson]: That's correct.

. . . .

Q: [By Defense Counsel]: Did Mr. Kite make any type of unusual movements as he exited his vehicle upon arrival?

A. [By Officer Wilson]: No, sir.

Q. Did he make any unusual or furtive movements as he walked to the apartment?

A. No, sir.

Q. Did he make any unusual or furtive movements as he approached the apartment?

A. No, sir.

Q. Did Mr. Kite knock on the door?

A. I can't say for sure.

Q. Did Mr. Kite have a key to the door of the apartment?

A. I don't know, sir.

---

**3.** On cross-examination, Officer Wilson testified that this action aroused his attention because, in his experience as a narcotics officer, he knows a narcotics conspirator tries to keep his distance from the illegal substances so it is more difficult to connect him to them.

Q. Was the door open?

A. I can't say.

Q. Did you see the front door of the apartment?

A. No, sir.

. . . .

Q: [By Defense Counsel]: Did you see the Defendant enter Apartment 511?

A. [By Officer Wilson]: No, sir.

Seven photographs of the apartments, parking lot and surrounding area were introduced into evidence. From the photographs, and the testimony of Margaret White, the manager of the apartments, it is clear and incontestible that Officer Wilson could not have seen Defendant (or the woman with the plastic bag) enter or exit apartment # 511. Apartment # 511 is in building five; there are 24 buildings of apartments in the complex. It appears that there are at least 14 apartments in building five; from the photos one can see apartments 509, 510, 511, 512 and 514. The front door to each apartment opens to a court yard with bushes and grass in the middle of building five; there are two levels of apartments. To get into the courtyard from the north parking lot where Officer Wilson was located, one would pass through an opening about 1½ car widths wide; the trees and bushes in the courtyard, as well as the location of the entry to apartment # 511, made it impossible for Officer Wilson to have seen anyone enter or exit through the door of apartment # 511 from his vantage points in the parking lot and in the bank parking garage behind the apartment parking lot.

The *most* Officer Wilson could have seen was a person entering from the parking lot into the courtyard, going straight in the direction of apartment # 511, rather than turning right. But other apartments were also located in the direction of apartment # 511, so a person could enter any of a number of apartments in that direction.

On direct examination, Officer Wilson testified that the woman with the plastic bag, and appellant, each entered and exited apartment # 511. Yet, on cross, Officer Wilson admitted he never saw either of them enter or exit apartment # 511. In fact, the evidence is clear that Officer Wilson could not possibly have seen either of them enter or exit apartment # 511. One question presented is whether Officer Wilson so badly recanted his testimony when cross-examined that we should discount all of his testimony, as a matter of law. As tempting as that might be, we cannot do so. The trial judge heard the testimony of Officer Wilson, both on direct and cross, as well as the rest of the evidence, and still concluded Officer Wilson had probable cause to arrest. The trial judge might reasonably have believed the portion of Officer Wilson's testimony that was not recanted, and we are not authorized to overturn the trial court's findings unless the balance of the evidence was insufficient to support the findings.

The following evidence is pertinent to the inquiry of whether the State met its burden of proof to show probable cause for the warrantless arrest:

1. A reliable, unidentified informant[4] gave Officer Wilson a tip that a drug transaction would take place at apartment # 511 between a white female and an unknown individual. The white female was to arrive at apartment # 511 within 20 minutes, and the buyer was to arrive within 25 to 45 minutes thereafter. A large quantity of MDMA tablets was to be the subject of the transaction.

2. Within 20 minutes, a white female drove up and parked near building five of the apartments where apartment # 511 was located. She walked into the inner courtyard of building five carrying a tennis racket and a white plastic bag. 10 to 15 minutes later, she walked out of building five to her car, placed the plastic bag in the trunk of the car, looked around

---

**4.** Appellant argues that the true informant here was Diane Yarcey who, while Officer Wilson was present, but outside Officer Wilson's hearing, told the confidential informant about the pending drug transaction. The confidential informant simply passed on what he had just heard from Yarcey. Appellant argues that since there is no evidence regarding Yarcey's reliability, we can't treat the tip as having come from a reliable, time-tested informant. We disagree.

nervously, and returned to building five. 10 to 15 minutes later, the same woman exited the courtyard of building five, went to her car and opened the trunk, picked up the plastic bag, returned it to the trunk, closed the trunk, and returned into the courtyard of building five. 10 to 15 minutes later, the same woman exited building five a third time, got in the car and drove around for about 10 minutes, stopped briefly at a convenience store to look in the windows, but did not go in; she returned to the apartment complex, parked the car approximately seven spaces to the west of where she had parked before, and took the white plastic bag with her as she walked into the courtyard of building five.

3. 10 to 15 minutes thereafter (10 to 30 minutes later than the informant had predicted) a white male drove up in a blue pick-up, and parked in a space near building five. He carried a blue shaving kit type bag, about 12 inches long and six to ten inches deep, which appeared to be a quarter to half full. He entered the courtyard of building five, and five minutes later he exited with the same bag which was now full to the bulging point. He put the bag in the open bed of the truck, and wedged it between a spare tire and the wall of the truck.

4. During the 1 to 1½ hours that Officer Wilson and his partner observed the apartments, a few other cars had come and gone in the parking lot area, and other people were observed "walking from building to building." Officer Wilson testified "there were [no] other people milling around apartment 511".

Appellant asserts that the State failed to meet its burden of showing that the warrantless arrest was valid under the Texas Code of Criminal Procedure articles 14.01 or 14.03. Appellant argues that Officer Wilson did not observe appellant engage in any illegal activity, and nothing the officer observed tied appellant to the female with the plastic bag. The thrust of appellant's argument is that, without seeing appellant enter apartment # 511, and without seeing appellant in the presence of the subject female at any time, Officer Wilson had no

reasonable basis to conclude that appellant had engaged in a transaction with the subject female; appellant could have entered any of the thirteen or more other apartments in building five just as easily as he could have gone to apartment # 511.

Appellant points to portions of Officer Wilson's testimony to show that article 14.-01 was not satisfied:

Q: [DEFENSE COUNSEL]: Did you see the Defendant commit an offense in your presence?

A: [OFFICER WILSON]: No, sir.

Q: Without the supposition in your mind, supposedly supplied to you by Diane Yarcey via the confidential informant, that the Defendant was allegedly committing a crime of possession of a controlled substance, did the Defendant do anything that was unlawful that you saw at that time?

A: Not unlawful, no, sir.

. . . .

Q: What acts did you specifically observe to make [you think] a drug transaction actually occur[red]?

A: Again, on the information that I had received.

Q: I'm saying, did you see any acts? Did you see any acts that you observed?

A: When you ask about specific acts, as far as exchange or anything like that, no, sir.

Officer Wilson further testified that he had no description of the person who was to buy the drugs, or of the clothing the person was to wear, or of the vehicle the person was to drive, nor had he had any acquaintanceship with appellant prior to that afternoon. He testified that there was nothing unusual about appellant. He indicated that appellant drove into the parking lot at the apartment complex, got out of his vehicle with a blue bag in hand and walked to the apartment complex. He stated that appellant made no unusual movements as he got out of his vehicle nor any unusual furtive movements as he walked to the apartment complex. He never saw which apartment appellant entered at the complex.

Appellant asserts that the foregoing testimony shows the officer did not view appellant engaging in any illegal activity, and thus the State failed to meet its burden of proving an exception to the warrant requirement under article 14.01.

The Court of Criminal Appeals has set out the principles of law that we must be guided by in this case:

> The standard for the legality of a warrantless arrest is not equal to the sufficiency of evidence for a conviction. The standard is 'probable cause,' not 'proof beyond a reasonable doubt.'
>
> . . . .
>
> The test for probable cause for an arrest without a warrant is:
>
> > Whether at that moment the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrested person] *had committed or was committing an offense.*
>
> An investigating officer's hunch, suspicion or good faith perception are not sufficient, alone, to constitute probable cause for an arrest. . . . Moreover, the perceived events must be out of the ordinary, suspicious and tie a suspect with a criminal act. The individual's conduct cannot be as consistent with innocent activity as with a criminal act. . . . On the other hand, this Court has previously upheld arrests under Art. 14.01, supra, when the police officers personally observed behavior that although not overtly criminal, was, when *coupled* with the officers' prior knowledge, sufficient to establish probable cause that an offense was *then* occurring. (citations omitted).

*Lunde v. State,* 736 S.W.2d at 667.

In the present case, the confidential informant had worked with Officer Wilson for about two years and had always provided accurate and reliable information. From the informant's information, Officer Wilson anticipated that a white female was going to arrive at apartment #511, which is in building five, within the next 20 minutes to deliver narcotics. The white female arrived on schedule. Her actions in walking back and forth from building five to the car to check on the plastic bag, and in making a short drive around the vicinity of the apartments, from the perspective of a person versed in law enforcement, could have led to a reasonable conclusion that she was there to deliver drugs, and that the drugs were in the plastic bag. During the period of the surveillance, no other people were seen by Officer Wilson in the vicinity of apartment #511 except the female and appellant. A little later, within the time frame given by the informant, appellant arrived, parked his truck near building five, walked into the courtyard of building five carrying a partially empty blue shaving kit, and exited after five minutes carrying a bulging full blue shaving kit. Instead of carrying the shaving kit with him into the cab of the truck, appellant wedged the kit between the spare tire and wall of the truck, as if to distance himself from something illegal.

Considering Officer Wilson's experience in the narcotics field, the corroborated information received, and the actions of appellant and his accomplice at the scene, we find that the evidence supports the trial court's conclusion that the officers had probable cause to believe that appellant possessed narcotics, thereby committing the offense of possession in the officers' presence. We hold that the trial court properly overruled appellant's motion to suppress because the warrantless arrest, and subsequent seizure of the MDMA tablets from appellant's truck, were lawful.

We overrule appellant's points of error.

The judgment is affirmed.