IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 21, 2024

## STATE OF TENNESSEE v. DASHAWN PATRICK SLOAN AND DEMETRIUS TREVON HIGGINS

**Appeal from the Criminal Court for Davidson County**
**No. 2018-B-721      Jennifer Smith, Judge**

_____

### No. M2023-00331-CCA-R3-CD

_____

A Davidson County Jury convicted DaShawn Patrick Slone[1] and Demetrius Trevon Higgins, Defendants, of first degree premeditated murder and abuse of a corpse. The trial court imposed effective sentences of life plus six years for Defendant Slone and life plus four years for Defendant Higgins. On appeal, Defendants contend that the evidence is insufficient to support their convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and TOM GREENHOLTZ, JJ., joined.

Michael L. Freeman, Nashville, Tennessee, for the appellant, DaShawn Patrick Slone.

Kevin Kelly (at motion for new trial and on appeal) and Mark Kovach (at trial), Nashville, Tennessee, for the appellant, Demetrius Trevon Higgins.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Glenn R. Funk, District Attorney General; Amy Hunter, Deputy District Attorney General; and Doug Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The indictment uses the spelling "Sloan," and this court traditionally uses a defendant's name as spelled in the charging instrument in the style of the case. However, in other parts of the record, including the trial transcript, judgment forms, and his notice of appeal, this Defendant's name is spelled "Slone," and the parties also refer to him as "Slone." Accordingly, we will use the spelling "Slone" in our analysis but keep "Sloan" in the style of the case.

# OPINION

## I. Factual and Procedural History

On April 13, 2018, a Davidson County Grand Jury indicted Defendants on charges of first degree premeditated murder and abuse of a corpse. Defendants proceeded to trial, where the following facts were established.

In 2017, Defendant Higgins conspired with Donte Calvert and Donnie Meadows to sell heroin. Defendant Higgins used Mr. Calvert and Mr. Meadows to sell heroin on his behalf, and Mr. Calvert and Mr. Meadows kept a cut of the drug profits for themselves. In an attempt to avoid detection by law enforcement, the group leased homes from Airbnb and also leased an array of vehicles to distribute the drugs. Defendant Slone was a close friend of Defendant Higgins and often was found in his company.

On July 6, 2017, Mr. Meadows, his girlfriend Haley Newcomb, and Mr. Calvert drove to Old Hickory Boulevard in Madison to purchase a firearm. When Mr. Meadows exited the car to buy the firearm, the purported seller, Jonathan Armstrong (the victim in this case), robbed Mr. Meadows at gunpoint of $200. Mr. Meadows then fled the scene on foot while the victim approached the car and robbed Mr. Calvert and Ms. Newcomb of $3,000 in cash and ten grams of heroin worth about $2,000. Both the money and the heroin belonged to Defendant Higgins; Mr. Meadows was to have sold the heroin on Defendant Higgins' behalf.

The news of the robbery enraged Defendant Higgins, with Mr. Meadows testifying that Defendant Higgins declared that the robber would have "to pay." Mr. Meadows, Mr. Calvert, and Defendants went to a shared apartment at 207 Suzanna Drive, where Defendant Slone and Mr. Meadows used Facebook to identify the victim as the robber. Defendants decided to drive to Nashville to find the victim.

Early in the morning on July 7, 2017, Defendant Higgins called Mr. Meadows and requested that they reconvene with Defendant Slone and Mr. Calvert. Mr. Meadows and Mr. Calvert drove a leased Chrysler 300 sedan to meet with Defendants at Carrol Street in South Nashville. When they arrived, Defendant Higgins told Mr. Meadows and Mr. Calvert to look in Defendant Higgins' leased sedan, a Chrysler 200, and when they did so, the victim lay dead in the front seat with two visible bullet wounds to his skull. Mr. Meadows testified he heard one of the Defendants declare, "that's what happens when somebody f*cks with my money." This left Mr. Meadows "terrified," as he "figured [he] was next."

The four men then cleaned everything out from the Chrysler 200 and placed it in the Chrysler 300, which was also leased to Defendant Higgins. Defendant Slone removed a gun from one of the vehicles and took it to his girlfriend's home at 25 Carroll Street. Mr. Calvert testified that around this time, Defendant Slone confessed to killing the victim. The group then drove the Chrysler 300 to a convenience store in South Nashville and filled a can of gasoline. The group returned to the Chrysler 200 and placed the gas can inside of it. Defendants drove the Chrysler 200, and Mr. Meadows and Mr. Calvert drove the Chrysler 300, to Cheatham County to burn the victim's body.

When both cars arrived in Cheatham County, Mr. Calvert stayed inside the Chrysler 300 because he did not want to be involved. Defendants and Mr. Meadows exited the car, and Defendant Slone poured gasoline over the Chrysler 200 and set it afire with the victim's body still inside. Defendants joked about how they murdered the victim, and Defendant Higgins said, "That's the way it's handled." From the way Defendants were joking, Mr. Meadows believed Defendant Higgins killed the victim. Mr. Meadows testified he went along to burn the car and body because he was high on drugs and was afraid that Defendants would kill him next.

Defendant Higgins later told Ms. Newcomb, Mr. Meadows' girlfriend, about killing the victim, stating, "that dumb*ss tried to sell the dope back to me." Ms. Newcomb also testified she heard Defendant Higgins "laughing, joking, saying that he was riding around with a dude's dead body for a while cussing him out."

On September 9, 2017, Cheatham County law enforcement notified Tennessee Bureau of Investigation (TBI) Special Agent Brandt Holt about a burned vehicle and body that two hunters had discovered. TBI scientists were able to use DNA evidence to determine the body belonged to the victim. Dr. Erin Carney, a forensic pathologist, conducted the victim's autopsy. She testified that the victim's cause of death was two gunshots to the head. The TBI confirmed the vehicle was a Chrysler 200 leased to Defendant Higgins in Michigan.

Investigators processed the vehicle for evidence and found both a spent shell casing on the driver's side and a bullet inside a passenger-side headrest. Agents also learned Defendant Higgins drove multiple Chrysler sedans at the Nashville airport in the days leading up to the shooting. A man who looked like Defendant Slone was seen often accompanying Defendant Higgins, and Defendant Slone was also identified at the airport in a Chrysler 200.

Law enforcement obtained GPS tracking data from the Chrysler 200 and cellphone call data from Defendants, the victim, Mr. Meadows, Mr. Calvert, and others. The tracking information suggested that early in the morning on July 7, 2017, the Chrysler 200 and the

victim's cellphone were together near 1230 11th Avenue South, the address of one of the victim's girlfriends. Later, the Chrysler 200 and the victim were together near the victim's personal residence at 904 Morrison Street. At 3:24 a.m., a text was sent from the victim's phone to the phone belonging to Defendant Slone's girlfriend; this text message contained the word "Spook," Defendant Slone's nickname. The data further established that Defendant Higgins left the victim's residence and stopped at Carroll Street. While there, Mr. Meadows, who was at the shared apartment on 207 Suzanna Street, called Defendant Higgins. Just after 4:00 a.m., the data showed Mr. Meadows leaving the shared apartment to meet Defendant Higgins at Carroll Street around 4:00 a.m. The data then showed the group driving in separate cars to Cheatham County while calling each other on the way. Furthermore, the data showed Defendants, Mr. Calvert, and Mr. Meadows simultaneously traveling to the area where the victim's body was set on fire.

Defendant Higgins introduced the pretrial hearing testimony of Danny Haskins in which Mr. Haskins, who was incarcerated in the Tennessee Department of Correction (TDOC) custody at the time of his testimony, took responsibility for the crimes. Mr. Haskins claimed that he killed the victim because the victim had been robbing people who sold drugs for him. Mr. Haskins testified he shot the victim in the parking lot of a "duplex" or "project;" specifically, Mr. Haskins claimed he shot twice at the victim, who was seated in a car, but that only one bullet connected. Mr. Haskins claimed he then drove to Antioch, Tennessee and burned the body and vehicle in a "rundown neighborhood." Mr. Haskins testified he was accompanied by one other person at the time of the shooting, but Mr. Haskins refused to identify anyone else involved in these offenses or who sold drugs for him, other than to state that the Defendants were not involved in the victim's death.

Mr. Haskins, suffering from the effects of cancer of the brain, pancreas, liver, and kidneys at the time of his testimony, struggled with certain details related to his testimony. Mr. Haskins claimed he met Defendant Higgins while in jail but did not know either Defendant at the time of the offenses in this case. He also acknowledged that in another pending murder case, he told his codefendants that he would take responsibility for committing the alleged offense. On cross-examination by the State, Mr. Haskins claimed that he made that decision because the codefendants in that case were not involved, but he also acknowledged he agreed to take responsibility if the codefendants would put money in his commissary account.

A Davidson County jury convicted Defendants on both counts of the indictment. The trial court sentenced Defendant Slone to life imprisonment for the first degree murder conviction and six years with 45 percent release eligibility for the abuse of a corpse conviction. The trial court sentenced Defendant Higgins to life imprisonment for the first degree murder conviction and four years with 35 percent release eligibility for the abuse of a corpse conviction. The trial court ordered consecutive sentences for both Defendants.

Both Defendants moved for a new trial, principally arguing that the evidence was insufficient to support their convictions. On February 17, 2023, the trial court denied both motions because there was "no basis for relief."

Defendants both timely appealed, and this court consolidated their appeals on March 29, 2023.

## II. Analysis

Defendants both argue that the evidence produced at trial was insufficient to sustain their convictions for first degree murder and abuse of a corpse. They argue the State's primary witnesses were neither credible nor was their testimony corroborated. The State argues the evidence is "more than sufficient to sustain the convictions, the credibility of the State's witnesses is not subject to review on appeal, and the witness testimony was corroborated." We agree with the State.

### A. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden shifts to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id*. (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, a reviewing court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

We also note that in its final instructions, the trial court charged the jury on criminal responsibility for both offenses. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). "Each party to an offense may be charged with commission of the offense." *Id.* § 39-11-401(b). Criminal responsibility for the conduct of another arises when a defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2).

1. First Degree Murder

Under Tennessee Code Annotated section 39-13-202(a)(1), first degree murder is the "premeditated and intentional killing of another." Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* § 39-13-202(e).

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021). The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

> (1) The use of a deadly weapon on an unarmed victim;
> (2) The particular cruelty of the killing;
> (3) Threats or declarations of the intent to kill;
> (4) The procurement of a weapon;
> (5) Any preparations to conceal the crime undertaken before the crime was committed;
> (6) The destruction or secretion of evidence of the killing;
> (7) Calmness after the killing;
> (8) Evidence of motive;
> (9) The use of multiple weapons in succession;
> (10) The infliction of multiple wounds or repeated blows;
> (11) Evidence that the victim was retreating or attempting to escape when killed;
> (12) The lack of provocation on the part of the victim; and
> (13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (first citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017); then citing *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013); then citing *State v. Kiser*, 284 S.W.3d 227, 268-69 (Tenn. 2009); then citing *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); and then citing *Bland*, 958 S.W.2d at 660). The jury may also infer premeditation or intent from a defendant's "planning activity" prior to the killing, a defendant's prior relationship with the victim that may imply "motive," and the "nature of the killing." *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

It is also "well established that the identity of the perpetrator is an essential element of any crime." *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021) (citations omitted). Consistent with our standard of review, identity may be proven by direct evidence, circumstantial evidence, or a combination of the two. *Id.*; *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Identity is a question of fact reserved for the jury's determination. *Miller*, 638 S.W.3d at 158-59; *see also State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005).

Defendant Slone acknowledges that the evidence produced at trial placed him and Defendant Higgins "within [ten] miles of a road that led to Cheatham County" and that the victim "was killed in retaliation for robbing one of the witnesses[.]" Still, Defendant Slone argues that "no proof show[ed] that there was any connection between the two defendants and the robbery that led to the murder." Both Defendants argue that no independent witnesses testified as to the Defendants' involvement in the murder. Indeed, both Defendants argue that Mr. Meadows and Mr. Calvert were biased witnesses and the jury should not have credited their testimony.

Viewed in the light most favorable to the State, the evidence showed that the victim was shot twice in the head hours after stealing $5,000 in drugs and cash from Mr. Meadows and Mr. Calvert. The cash and drugs belonged to Defendant Higgins who was enraged by the robbery. After identifying the victim as the robber, Defendant Slone left his prior location for several hours, and GPS tracking information and cellular phone data showed that the victim was in close proximity to Defendant Higgins' Chrysler and Defendant Slone's girlfriend's residence the rest of the night. The proof also showed that same Chrysler was around the victim at the time of his death, and that shortly after the victim was seen alive for the last time, the victim's phone sent a text to Defendant Slone's girlfriend using Defendant Slone's street name.

Soon thereafter, Defendant Slone picked up Defendant Higgins, and Defendant Higgins later called Mr. Meadows and Mr. Calvert, telling them to come to South Nashville. Upon Mr. Meadows' and Mr. Calvert's arrival, they discovered the victim's deceased body in the leased Chrysler 200. Defendants both claimed responsibility for the killing.

Both Defendants argue that the jury should not have credited Mr. Meadows and Mr. Calvert based on their involvement in the offenses, interest in avoiding criminal liability, and criminal histories. As relevant to this contention, at trial Mr. Meadows testified that although he asked for a favorable plea offer from the State to testify against Defendants, "[n]o one would ever give it to [him]." When asked whether "anybody promise[d] you anything for your testimony here today," Mr. Meadows replied, "No, ma'am." Even so, Mr. Meadows decided, "The best thing to do was tell the truth." Mr. Calvert testified that he feared Defendants and did not want to testify against them out of fear of retaliation from them or their acquaintances. He testified that he received threats via social media from Defendant Higgins' acquaintances. The State had to arrest him, put him on an ankle monitor, and bring him to trial to testify.

Despite these potential credibility concerns, the jury, through its verdicts, accredited the testimony of these witnesses. This was the jury's prerogative, not ours. We observe that both Mr. Meadows and Mr. Calvert testified that Defendants killed the victim. Mr. Meadows and Mr. Calvert explained that when they were called to meet up with Defendants later in the night, Defendant Higgins told them to go over to his car where the victim's corpse was. Mr. Meadows and Mr. Calvert observed the victim's corpse with "two bullet holes in his head." One of the Defendants told Mr. Meadows "that's what happens when somebody f*cks with my money." Mr. Calvert testified that Defendant Slone said he killed the victim.

A jury's credibility decisions are within the jury's sound discretion as the trier of fact. *Bland*, 958 S.W.2d at 659; *Pruett*, 788 S.W.2d at 410. As stated above, a guilty verdict shifts the burden to Defendants to prove why the evidence is insufficient, and "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *Majors*, 318 S.W.3d at 857); *Cabbage*, 571 S.W.2d at 835. We conclude that the jury acted rationally in crediting the testimony of Mr. Meadows and Mr. Calvert and rejecting the testimony of Mr. Haskins. We will not disturb those findings on appeal. *See Stephens*, 521 S.W.3d at 724.

Defendant Higgins also argues that the cellphone data and GPS tracking information only show that his phone and car were involved in the murder, not Defendant Higgins himself. This argument is meritless. The jury made the reasonable inference that during the offense Defendant Higgins' cellphone was on his person and that he was in possession of his car, and we view the evidence in the light most favorable to the State on appeal. *See Bland*, 958 S.W.2d at 659; *Pruett*, 788 S.W.2d at 410; *Davis*, 354 S.W.3d at 729.

As to premeditation, the trial produced ample evidence that would have allowed a rational trier of fact to find that Defendants previously formed the intent to kill the victim.

Such evidence included Defendant Higgins' declaration that the victim would have "to pay," the procurement of a weapon, the use of rental cars to find the victim in an attempt to avoid identification, the burning of the Chrysler 200 and the victim's body in an effort to destroy evidence, calmness after the killing (indicated by Ms. Newcomb's testimony that Defendant Higgins drove around joking about the murder with the victim's body in the car), Defendants' motive to retaliate against the victim for his robbery, the infliction of multiple gunshot wounds to the victim's head, and Defendants' failure to render aid to the victim. *See Reynolds*, 635 S.W.3d at 916-17.

Finally, we observe that while the State did not clearly establish which Defendant pulled the trigger and killed the victim, a rational jury could have found both Defendants guilty of first degree murder under a theory of criminal responsibility. *See* Tenn. Code Ann. §§ 39-11-401, -402. The proof showed Defendants investigated the robbery together, planned the killing together, traveled to South Nashville together, and both took credit for the killing in some fashion. *See, e.g.*, *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 386). Thus, the evidence is sufficient to sustain Defendants' convictions on first degree murder.

## 2. Abuse of a Corpse

Under Tennessee Code Annotated section 39-17-312(a)(1), to prove that a defendant abused a corpse, the State must show that the defendant knowingly "mistreat[ed] a corpse in a manner offensive to the sensibilities of an ordinary person." As noted, "identity of the perpetrator is an essential element of any crime." *Miller*, 638 S.W.3d at 158 (citations omitted).

The evidence is also sufficient for a rational trier of fact to find that Defendants are guilty of abuse of a corpse. Credited testimony showed that both Defendants participated in moving the body to a secluded area and setting the car on fire with the body inside. Cellphone data and GPS tracking information corroborated this testimony. This evidence showed that Defendants drove the victim's body to Cheatham County and that Defendants' Chrysler 200 was in the same area where the victim's body was burned beyond recognition. *See State v. Williams*, No. M2014-02049-CCA-R3-CD, 2015 WL 5032051, at *3 (Tenn. Crim. App. Aug. 26, 2015) (declining to find the evidence insufficient when the victim was shot in the head and his body was rolled into a blanket, crammed into a backseat, and driven to a secluded area before the car and body were burned beyond visual recognition); Tenn. Code Ann. § 39-17-312(a)(1). Thus, Defendants are not entitled to relief on this issue.

### 3. Corroboration of Testimony

Defendant Slone also argues that Mr. Calvert's testimony about Defendant Slone's involvement in the murder of the victim was not corroborated, and "alone, could not be used as the basis for the conviction."

Under Tennessee law as it stood when the trial in this case commenced,[2] "[w]hen the *only* proof of a crime is the uncorroborated testimony of an accomplice, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 568 S.W.3d 101, 133 (Tenn. 2019) (emphasis added) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). The Tennessee Supreme Court has defined "'accomplice' to mean 'one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime.'" *Id.* (quoting *Collier*, 411 S.W.3d at 894). Further, "accomplices cannot corroborate each other." *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. 2001) (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)). "The test for whether a witness qualifies as an accomplice is whether the alleged accomplice could be indicted for the same offense charged against the defendant." *Jones*, 568 S.W.3d at 133 (internal quotation marks omitted) (quoting *Collier*, 411 S.W.3d at 894).

Separately, the Tennessee Supreme Court has explained the nature of required corroboration evidence:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate,

---

[2] We note that on March 7, 2024, the Tennessee Supreme Court abolished the accomplice-corroboration rule. *State v. Thomas*, __ S.W.3d ___, No. W2019-01202-SC-R11-CD, 2024 WL 979852, at *11-16, (Tenn. 2024). However, it chose to do so prospectively in the interest of fairness and due process. *Id.* at *13 ("[I]n the interest of fairness, we will apply the common law accomplice-corroboration rule to Ms. Turner's case, but the rule will be abolished in its current form going forward and that change shall be applied to all trials commencing after date of the mandate."); *see also* Tenn. R. App. P. 42(a) ("The clerk of the Supreme Court shall transmit to the clerk of the trial court the mandate of the Supreme Court, with notice to the parties, 11 days after entry of the judgment unless the court orders otherwise."). The court specifically declined to apply its ruling to *Thomas* itself and to "other pending cases that have not yet reached final judgment." *Thomas*, 2024 WL 979852, at *13-15. Accordingly, we apply the common law accomplice-corroboration rule as it stood before the Tennessee Supreme Court's opinion in *Thomas*.

in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (alteration in original) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994), *superseded by statute on other grounds*, Tenn. Code Ann. § 39-13-204(i)(2), *as recognized in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004)).

First, we note that neither Mr. Calvert nor Mr. Meadows has been established as an accomplice in this case. The evidence does not show that either witness participated in the planning of the murder, was present for the killing, or voluntarily participated in burning the victim's body. As such, the State was not required to corroborate their testimony.

Assuming *arguendo* that Mr. Calvert and Mr. Meadows do qualify as accomplices, the State still presented independent evidence that corroborated their testimony. Ms. Newcomb testified to Defendant Higgins' involvement; she heard Defendant Higgins "laughing, joking, saying that he was riding around with a dude's dead body for a while cussing him out." The cellphone data and GPS tracking information also corroborated Mr. Calvert's and Mr. Meadows's testimony. This evidence showed that Mr. Meadows and Mr. Calvert met Defendants at 207 Suzanna Drive after the robbery, that Defendant Slone left and later returned to pick up Defendant Higgins, that Defendants then went to South Nashville, and that Mr. Meadows and Mr. Calvert met with Defendant in South Nashville after Defendant Higgins called them. This evidence also showed the victim was near Defendant Slone's girlfriend's residence for hours leading up to his murder, and that Defendant Slone's vehicle was present and near the victim around the time of his death. The State also provided text messages from around that time from the victim's phone to Defendant Slone's girlfriend, using Defendant Slone's street name. The GPS data also shows that Defendant Slone was near, or at, where the victim's body was burned. This independent evidence corroborates Mr. Meadows's and Mr. Calvert's testimony. *See Shaw*, 37 S.W.3d at 903 (explaining that "corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction").

Defendants both argue that cellphone data may not always be precise and that it may only indicate a ten-mile area. However, the cellphone data was consistent with the vehicle's GPS tracking information. In sum, the evidence was more than sufficient to corroborate the State's witnesses, even if we were to consider them accomplices. Defendants are not entitled to relief.

## III. Conclusion

Based on the foregoing reasons and authorities, we conclude that the evidence was sufficient to support Defendants' convictions, and we affirm the judgments of the trial court.

_____
MATTHEW J. WILSON, JUDGE