# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE

Assigned on Briefs November 12, 2024, at Jackson

## STATE OF TENNESSEE v. TIMOTHY RONALD CUNNINGHAM

**Appeal from the Criminal Court for Knox County**
**No. 124018   G. Scott Green, Judge**

_____

### No. E2024-00521-CCA-R3-CD
_____

Defendant, Timothy Ronald Cunningham, appeals his convictions for aggravated assault with a deadly weapon, aggravated assault while under an order of protection, reckless endangerment with a deadly weapon, and domestic assault. The trial court imposed an effective sentence of ten years of confinement. On appeal, Defendant contends that the evidence is insufficient to support the convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and J. ROSS DYER, JJ., joined.

J. Liddell Kirk (on appeal), Madisonville, Tennessee, and Michael Graves (at trial), Knoxville, Tennessee, for the appellant, Timothy Ronald Cunningham.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Charme Allen, District Attorney General; Christy Caviness and Robert Debusk, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Facts and Procedural History

On March 9, 2023, a Knox County Grand Jury indicted Defendant, Timothy Ronald Cunningham, for his assault of the victim, Tabitha Franklin, that occurred on December 19, 2022. The five-count indictment charged Defendant with: aggravated assault with a deadly weapon (Count 1), aggravated assault while under an order of protection (Count 2),

reckless endangerment with a deadly weapon (Count 3), domestic assault (Count 4), and domestic assault with a prior domestic assault conviction (Count 5). Defendant proceeded to trial where the following evidence was presented.

Around 9:00 a.m. on December 19, 2022, Katherine Mosteller was driving on Barnard Road when she came upon a white SUV in the middle of the road and a smaller silver car on the side of the road. The vehicles were so positioned that Ms. Mosteller was required to come to a stop. Ms. Mosteller testified she was not able to see inside the smaller silver car but saw a woman standing "very close" to that car. The woman was yelling and appeared to be upset. Ms. Mosteller witnessed the SUV ram into the silver car "three or four times" times before Ms. Mosteller drove away. Ms. Mosteller confirmed that she called 911.

On the same day at approximately 8:40 a.m., Nicholas Broyles awoke to the "sound of a loud bang" behind his Knox County home. To Mr. Broyles, "it sounded like a crash." Mr. Broyles looked out his window and saw a silver Chrysler 200 against the guardrail on the nearby road "right behind" his house. Upon leaving his back door, Mr. Broyles "saw a lady" in the silver car. Mr. Broyles testified that he saw a white Lincoln SUV "barreling" towards and strike the silver car about twenty feet from where he was positioned.[1] He said he could see everything "clearly." Mr. Broyles said that after the SUV had struck the silver car, the woman "had gotten towards the guardrail or behind, so I felt like that was a good time to try to get somebody out there and help out." After the SUV "retreated to the apartments behind," Mr. Broyles called 911. He identified Defendant as the driver of the SUV. Mr. Broyles confirmed that he recorded two videos from the incident after he saw the SUV "intentional[ly] hit" the car. The videos Mr. Broyles recorded that day were published to the jury.

The State called the victim as its next witness. The victim testified that she had been married to Defendant for a year and a half and in a relationship with him for six years. The victim stated that she and Defendant were arguing all night on December 18, 2022, and she suggested a divorce. Defendant said he did not want a divorce and left their house. Upon Defendant's return the next morning, the couple resumed arguing and decided to go to "the bank" to sign divorce papers. The victim drove a silver Chrysler 200, while Defendant drove a white Lincoln SUV accompanied by his son, Timothy Robert Cunningham. Once on Barnard Street, the couple began arguing again. The victim said that she drove around Defendant, intentionally blocking the road, got out of her car, and "took off walking up the

---

[1] Mr. Broyles testified that he saw a white Lincoln Navigator. However, Defendant drove a white Lincoln Aviator. Given Defendant does not dispute identity, we will refer to Defendant's vehicle as an "SUV" for consistency.

street." She turned around when she heard Defendant drive his SUV into hers, but did not go back to the vehicles.

The victim did not recall several statements that she made to officers following the incident. She did not recall stating to officers that after Defendant claimed that he did not know the way to the bank and that he would follow the victim, Defendant proceeded to ram her car while she was still in it. The victim did not recall stating to Investigator Jeremy Wise that Defendant "just started ramming me. He kept ramming me even after I jumped out of the car, he just kept ramming me – ramming the car." The victim claimed that she did not recall telling an officer that "I was coming this way up the hill, and he rammed me. And then he just kept ramming me until [the victim's car] turned." The victim did not recall stating that Defendant "said he was not giving me a divorce and he started saying that he would hurt me, you know, he would make sure that he didn't give me a divorce." The victim did not recall stating that she climbed out of the passenger side of her car to exit. The victim did not recall stating that she was "fine," "just shook up," and that "[i]t was really scary." She testified that Defendant struck her car with his SUV "like two times," but after she "got out of the car." The victim alleged her inability to remember her statements was due to her being intoxicated the day of the incident. She said, "I was drunk that day. . . . I had been up for three days, and I was drunk. I really don't remember what I said."

The victim confirmed that she was with Defendant on December 20, 2022, the day he was arrested, and that she and Defendant shared several phone calls while he was in jail. Portions of three of these recorded phone calls were played at trial. During a call made on December 30, 2022, Defendant stated that the video of the SUV running into her car looks "a little serious" and that "it was a lot worse than it really was." The victim responded that "it was a crime of passion." During a call made on January 26, 2023, Defendant stated that it hurt him that victim wanted him to sign the divorce papers. During a call made on January 27, 2023, Defendant told the victim that she did not have to testify, and the victim stated that she would refuse to testify. Also on that call, Defendant stated that he previously had claimed that he was not driving and was not trying to kill her.

On cross-examination, the victim stated that the night before the incident she had consumed alcohol, cocaine, and Xanax, and repeated that she had been up for at least three days. The victim alleged that she was angry when Defendant left the house the night before the incident because she "thought [that Defendant] was out with another woman." When Defendant returned the next day, she stated that she wanted to file for divorce, and they decided to go to the bank. While traveling to the bank, they stopped and began arguing again. The victim parked her car, blocking the roadway, and started walking back home. She stated that, after she began walking away, Defendant drove his SUV into her car a couple of times. The victim admitted she witnessed Defendant hit the car the second time

but proceeded to walk home. She claimed that her daughter drove her back to the scene after she had been gone for thirty to forty-five minutes. She alleged that she was upset with Defendant from the night before and that she made statements to the police to get him in trouble.[2] The victim said that at no time was she in fear of any danger nor was she ever close enough to the car to be injured when Defendant drove into it.

Knox County Sheriff's Department ("KCSD") Deputy Joseph Stainback testified that he was the first law enforcement officer to arrive at the scene. He noticed "a damaged vehicle that was off the roadway" and "quite a bit of debris in the roadway itself as well as a [SUV] that was farther down the road." He stated the scene "didn't look natural." He identified photographs of Defendant's SUV from that day, which showed damage to the vehicle.

Deputy Stainback encountered the victim and her daughter in another vehicle close to victim's damaged car. The deputy acknowledged that his body camera recorded his interactions with the victim and her daughter. The recording was played at trial and recorded the deputy's encounter with the victim and his processing of the scene of the incident. The victim stated to the deputy that she was "fine," and she was "just shook up. It was really scary." The deputy affirmed that he had received training in recognizing signs of impairment. He stated that in speaking with the victim he did not recognize any signs of intoxication and did not think she was impaired. The victim did not mention consuming drugs or alcohol on the recording.

KCSD Detective Jeremy Wise testified that he also responded to the scene of the incident. He stated that he did not notice any signs of intoxication in his interactions with the victim. His interactions with the victim were recorded via body worn camera and were published at trial. The recording showed the detective processing the scene of the incident and his interviews of the victim and Mr. Broyles. During his interview with the victim, she stated, "And when I went to go around him to get in front of him, he smashed me . . . he just kept on ramming me." The victim further stated that Defendant continued to ram the car after she had jumped out of it and was standing next to it.

---

[2] At this point in the victim's testimony, the trial court intervened and informed the victim of her *Miranda* rights. The trial court informed the victim that deliberately lying to the police during an investigation was a crime and that she could not be compelled to incriminate herself. The victim stated that she understood and acknowledged her right to remain silent.

The Defendant called two witnesses: Thalia Rochelle Franklin and Timothy Robert Cunningham.[3]  Thalia testified that she received a call from her mother, the victim, on the day of the incident, and that she picked up the victim at the intersection of Barnard and Woods-Smith around 9:00 a.m.  Thalia recalled that her mother was "upset" and that she took the victim to a store located about two minutes away from the incident scene.  She stated that the victim purchased two beers and a pack of gum.  They then drove to the victim's home where the victim drank the beer and consumed a line of cocaine.  Thalia said that they drove back to the scene of the incident, and the victim began chewing gum to cover the smell of alcohol.

Robert Cunningham, Defendant's son, confirmed that he had prior convictions for theft, robbery, and felony possession of marijuana.  Robert stated that on the day of the incident, Defendant picked him up on the way to file divorce papers.  He stated that they were following the victim when she pulled off the side of the road and spoke with Defendant.  Robert said that he then saw the victim get out of her car and walk up the hill.  Defendant then hit the victim's car with his SUV and drove away.  Robert stated that the victim was twenty to thirty feet from the car when Defendant first hit it.

Defendant elected not to testify.  The parties stipulated that at the time of the offense, Defendant was enjoined and restrained by an order of the Criminal Court for Knox County from assaulting or attempting to assault the victim.  The order was entered on July 7, 2022, and a signed stipulation was entered into the record.

At the conclusion of the trial, the jury found Defendant guilty of aggravated assault with a deadly weapon, aggravated assault while under an order of protection, reckless endangerment with a deadly weapon, domestic assault, and domestic assault with a prior domestic assault conviction.  Because the jury convicted Defendant of aggravated assault, the State agreed to dismiss the conviction for domestic assault with a prior domestic assault conviction.  At a sentencing hearing, the trial court merged the two aggravated assault convictions and imposed concurrent sentences of ten years on Counts 1 and 2, four years on Count 3, and eleven months on twenty-nine days on Count 4, for an effective sentence of ten years' imprisonment on Defendant's counts of conviction.[4]

Defendant filed a timely motion for new trial challenging the sufficiency of the evidence to sustain his convictions.  The trial court denied the motion, and Defendant timely filed a notice of appeal.

---

[3] We will refer to Thalia Rochelle Franklin by her first name, Thalia, and Timothy Robert Cuningham by his middle name, Robert, because of their similar names to the victim and Defendant.  No disrespect is intended.

[4] Defendant raises no sentencing issues on appeal.

## II. Analysis

Defendant argues the evidence was not sufficient to sustain his convictions. Specifically, Defendant contends there was insufficient proof that he knowingly caused the victim to fear imminent bodily injury because of inconsistencies in witness testimony as to the victim's location when Defendant struck her car. According to Defendant, "a reasonable interpretation of the evidence could conclude that [Defendant] at least believed [the victim] was no longer inside the vehicle, and that his actions were reckless and not intentional. The State argues that when viewed in the light most favorable to the State, the evidence was sufficient to establish Defendant's convictions. We agree with the State.

### A. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(e). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to show why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id*. at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## B. Applicable Law

As applicable to the instant case, a person commits aggravated assault who "[i]ntentionally or knowingly commits an assault" and the assault "[i]nvolved the use or display of a deadly weapon[.]" Tenn. Code Ann. § 39-13- 102(a)(1)(A)(iii) (Supp. 2022). A person also commits aggravated assault "who, after having been enjoined or restrained by an order . . . of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual . . . intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against the individual." Tenn. Code Ann. § 39-13-102(c) (Supp. 2022). A person commits assault who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" Tenn. Code Ann. § 39-13-101(a)(2). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(3). As applicable to the instant case, a "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(6)(B). Motor vehicles can constitute deadly weapons for aggravated assault. *State v. Tate,* 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995).

Relevant to this appeal, a person commits reckless endangerment by "recklessly engag[ing] in conduct that places or may place another person in imminent danger of death or serious bodily injury," and the reckless endangerment is "committed with a deadly weapon." Tenn. Code Ann. § 39-13-103(a), (b)(2). Specific to reckless endangerment, a motor vehicle can constitute a deadly weapon. *State v. Wilson*, 211 S.W.3d 714, 719 (Tenn. 2007) (citing *Tate*, 912 S.W.2d at 787). A domestic assault is an assault against "a domestic abuse victim." Tenn. Code Ann. § 39-13-111(b). A "domestic abuse victim" includes a current or former spouse. Tenn. Code Ann. § 39-13-111(a)(1).

## C. Sufficiency of the Evidence

As stated, Defendant generally argues on appeal that the evidence was insufficient to support his convictions. He also specifically contends "that the evidence is insufficient to establish that he knowingly caused [the victim] to fear imminent bodily injury." We disagree.

Here, when viewed in the light most favorable to the State, the evidence was sufficient to support Defendant's convictions, and that he knowingly caused the victim to fear imminent bodily injury and placed her in imminent danger of that risk. The night before the incident, Defendant and the victim—his wife—were engaged a marital argument that upset Defendant. When the couple decided to go the next morning to sign divorce

papers, the two drove separately—the victim by herself and Defendant with his son. Defendant and the victim pulled up alongside one another on a roadway and resumed arguing. Defendant then drove his SUV into the victim's car while she was still in the car. Mr. Broyles witnessed this happen. The victim got out of her car, and Defendant continued to ram her vehicle while she was still close to it. Ms. Mosteller saw the victim standing "very close" to the car while Defendant rammed it "three or four times" with his SUV. The victim also told law enforcement she was driving her car when Defendant rammed it and was standing next to it while Defendant continued to hit the car. A recording of that statement was published to the jury. While the victim told the deputies she was "fine" and "just shook up" at the scene of the incident, she also said "[i]t was really scary." This evidence is sufficient to establish Defendant's conduct placed the victim in imminent danger of death or serious bodily injury and knowingly caused her to fear that risk.

As to his aggravated assault and assault convictions, Defendant argues that there was "uncertainty" as to where the victim was in relation to her car and that "a reasonable interpretation of the evidence could conclude that [Defendant] at least believed [the victim] was no longer inside the vehicle." Thus, Defendant asserts that he may have acted recklessly, but not knowingly. While the victim did testify that she was not in the car when Defendant first rammed it and that she was intoxicated during the incident, the jury was free to reject her testimony. *Bland*, 958 S.W.2d at 659. The other proof in the case says otherwise. Mr. Broyle's testimony directly contradicts the victim's testimony, as does the deputies' testimony and the body-worn camera recordings of the victim's statements she made the day on the incident. The phone calls made between the victim and Defendant while he was in custody suggest that the victim planned to refuse to cooperate in Defendant's prosecution. Questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *Id.* This was the jury's prerogative, and we will not disturb the jury's findings on this issue. *Id.*

Accordingly, the proof was sufficient for the jury to find Defendant guilty on all counts, and he is not entitled to relief.

III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
/s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE

- 8 -