IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2024

## STATE OF TENNESSEE v. JASON DAVID BAINE

**Appeal from the Circuit Court for Decatur County**
**No. 21-CR-69       J. Brent Bradberry, Judge**
_____

**No. W2024-00573-CCA-R3-CD**
_____

A Decatur County jury convicted Jason David Baine, Defendant, of two counts of assault and one count of reckless endangerment with a deadly weapon. He received an effective sentence of two years of incarceration to be served at a rate of at least thirty percent. On appeal, Defendant contends the evidence was insufficient to support his convictions. After review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Terry Lee Dicus, Jr., Savannah, Tennessee, for the appellant, Jason David Baine.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase and Katherine C. Redding, Senior Assistant Attorneys General; Neil Thompson, District Attorney General; and K. Michelle Morris, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  FACTUAL AND PROCEDURAL BACKGROUND

On the night of October 30, 2020, Defendant was driving his vehicle in Decatur County when Leigh Ann Barnett,[1] one of the two victims, pulled up behind Defendant at a

---

[1] At the time of the incident, Ted Barnett and Leigh Ann Barnett were not yet married, and Mrs. Barnett's last name was Griggs. At the time of trial, however, they were married, and we will refer to her as Mrs. Barnett in this opinion.

stop sign. After sitting behind Defendant at the stop sign for a few minutes, Mrs. Barnett eventually honked her car horn at Defendant. The events that followed led to the Decatur County Grand Jury indicting Defendant on two counts of assault and one count of reckless endangerment.

At trial, Mrs. Barnett was the first witness to testify for the State. She stated that on the evening of the incident, she was driving her black Dodge Avenger home from her job as a nurse at an assisted living facility. After she left work, she drove through downtown Parsons. She came to a stop sign and stopped behind a maroon vehicle, which was being driven by Defendant. According to Mrs. Barnett, "[W]e sat there for a few minutes. It was a full moon. I stuck my camera, my phone out and took a picture of the full moon. . . . I posted it on Facebook, and then sat there for a little bit more." She testified that she then "[t]ooted [her] horn" because she was not sure why the vehicle in front of her was not moving from the stop sign. She sat there for "a few minutes more."

According to Mrs. Barnett, Defendant eventually began driving past the stop sign, but he then stopped in the road while Mrs. Barnett was still waiting at the stop sign. Describing this encounter with Defendant's vehicle, Mrs. Barnett said that "he does this little kind of sideways thing and rolls his window down . . . I still didn't see him . . . I didn't engage because I didn't – I wasn't trying to fight with somebody. I just wanted to go home." Defendant then pulled up to the next stop sign, and Mrs. Barnett was able to pull her car out onto the roadway. They then sat at the next stop sign for a "few more minutes" until he pulled his vehicle onto the roadway where "he does this little zigzag or snaking motion until we get – start to go around the curve because thank God he's not doing it when we go around the curve because I was afraid because . . . if somebody [had] come around that curve, there'd have been an accident."

At one point, Defendant turned his vehicle into a parking lot. However, when Mrs. Barnett passed his vehicle, Defendant immediately "pulled out and was right on" her. Mrs. Barnett continued driving until she approached another stop sign. She came to a complete stop at the stop sign and testified "when I came to the stop, I thought he was going to hit me. He didn't. But he got real close." They continued driving, with Defendant following closely behind Mrs. Barnett. Mrs. Barnett stated that she felt like she was being "tailgated."

As she was approaching the "main red light in Parsons," the light was yellow. She sped up to continue through the light, hoping that the red light would stop Defendant from following her. That did not happen, however, and Defendant proceeded through the intersection directly behind her.

Mrs. Barnett testified that after Defendant followed her through the light, she believed she needed to call the police. She felt uneasy and stated that if she had seen a

police officer, she would have pulled over. She said she was becoming fearful. Therefore, Mrs. Barnett attempted to call 911 several times, but she did not have a cellular signal and her phone call would not connect. "I'm just hanging up and dialing . . . . the signal, it just drops and so, I'm trying to call again and keep trying to call." Mrs. Barnett continued driving and sped up to approximately seventy miles per hour, but Defendant followed closely behind and would not allow her to put any distance between their two vehicles. Mrs. Barnett said that "the faster I got, the faster he got." Mrs. Barnett said there were opportunities for Defendant to pass her vehicle, but he did not.

Eventually, Mrs. Barnett put on her turn signal as she approached the road on which she lived. She then turned and traveled "too fast" down the road because she "was trying to get away from" Defendant. She testified that her speed was "too fast" for that road because "there's a lot of deer traffic, and it's a skinny road, and there is no leeway. When you run off the road there, you're hitting a ditch or a tree." The road also had hills and curves that could obstruct a driver's view. Mrs. Barnett stated, "I was going as fast as I could without killing myself." She "kept thinking he's so close to me that if a deer jumps across the road, I hope I don't have to hit my brakes because we're going to be in the ditch dead because he's – I'm going fast, and he is right on me."

Throughout the ordeal, Mrs. Barnett had been attempting to call 911 and Mr. Barnett. She was finally able to connect on a call with Mr. Barnett and told him that she was on her way home and someone was "chasing" her. She said she was almost home, but then she lost her cell phone signal. Mrs. Barnett still had no idea who was in the car behind her. She arrived at her home and pulled sideways into her driveway to prevent Defendant from following her any farther because her children were in her house. She testified that "I wanted whatever was going on to stop right there" because she was fearful for her children's safety.

Defendant also stopped in front of Mrs. Barnett's house and got out of his vehicle. Mrs. Barnett exited her car and asked Defendant if there was a problem. Defendant replied "[Y]eah . . . there's a big problem." Mrs. Barnett recognized Defendant to be one of her father's former co-workers. When Mrs. Barnett began to explain who her father was to Defendant in an attempt to "diffuse the situation," Defendant "pulled off his shirt and was dancing around in the road like he was a boxer." Mrs. Barnett testified that Defendant said that he wanted to "beat the sh[**] out of me and then when I mentioned my daddy, he said, F [your father], I'll - - I'm going to go kill him when I'm done killing you." Adding to Mrs. Barnett's anxiety, Defendant kept reaching into his car. Mrs. Barnett said she was afraid he might be about to pull out a gun. Recalling the event, Mrs. Barnett said that "all I could think of was my kids are in that house, and I'm fixing to be murdered in my driveway."

Mr. Barnett then came down from the house, and Mrs. Barnett stood behind him. When Defendant kept reaching in his car, Mrs. Barnett noticed a bat in her car and handed it to Mr. Barnett for protection. Mrs. Barnett testified that when she stepped behind Mr. Barnett and handed him the bat, Mr. Barnett told her to go into their house and call 911, which she did. Mrs. Barnett testified that she continued to be afraid of Defendant at the time of the trial, and Defendant was aware of where she lived. Mrs. Barnett stated that since the incident, she rarely left her home, she only would go to Parsons by herself to meet Mr. Barnett, and she was not as social as she used to be.

Mr. Barnett testified that on the night of the incident, he was at home watching television when he received a call from Mrs. Barnett between 7:00-7:15 p.m. Recounting the call with her, Mr. Barnett said that she was "[f]rantic. I could tell she was upset. She said there's somebody following me on the way home, and the phone, like I said, not good service out there. The phone just went dead."

After the phone call dropped, Mr. Barnett went out of the back door of his home. He could hear two cars coming down the road, and he could tell that they were traveling faster than a normal speed. He stated that as he was standing there, Mrs. Barnett's car and Defendant's vehicle drove in front of the house with "one behind the other one." Mrs. Barnett's car went past their second driveway and "pulled in right there and stopped" just off the roadway. Defendant's vehicle, which Mr. Barnett described as small and maroon in color, "pulled in right almost behind her but maybe just one car length ahead of her on the – like over to the side of the blacktop road."

After Mr. Barnett saw Defendant stop in the roadway, he witnessed Defendant exit his vehicle, which "scared" Mr. Barnett. According to Mr. Barnett, "I see [Defendant], I've never seen him before, out of the car. He's hot." Defendant then took his shirt off and was behaving aggressively towards Mrs. Barnett – using "cuss words." Mrs. Barnett was standing right beside her car, and Defendant was screaming at her. Mr. Barnett testified "I just stepped in front of her and was trying to get her behind me to get in between her and him. I'm like, hold up . . . . I didn't know what to say other than what's going on[?]"

At one point, Defendant returned to his vehicle and was "rummaging around in the back." Mr. Barnett was afraid that Defendant was looking for a weapon in his vehicle, but he never saw a weapon. Defendant never physically attacked anyone despite stating "I'll whoop you and her both." Mr. Barnett was convinced that Defendant was ready to fight because Defendant's shirt was off, and he was "dancing around in the road, you know, he's like come on, I'll whoop both of y'all right now." Mr. Barnett said Defendant was "agitated."

- 4 -

In an effort to resolve the dispute, Mr. Barnett repeatedly told Defendant "this is over for tonight." Mr. Barnett testified that he was "trying to deescalate." He said, "I wasn't mad. I was – I was fearful a little bit, but I wasn't mad at him." This continued for around four or five more minutes, "and then it was just like a switch went off," and Defendant got into his vehicle and left. Regarding whether Mr. Barnett used or displayed any weapons during this incident, Mr. Barnett acknowledged that he had the bat that Mrs. Barnett had given him from her car, but he never had a gun.

During the altercation, Mr. Barnett insisted that Mrs. Barnett leave and return to the house. Their children were in the home. After Mrs. Barnett got back to the house, she called 911. Law enforcement came to the Barnett's home and took statements from them about the incident that occurred that evening. According to Deputy Clyde Weaver – who was employed with the Decatur County Sheriff's Office at the time of this incident – Mrs. Barnett was "highly upset" and "very fearful" when he arrived at her home, but she did not appear to be angry.

Defendant testified in his own defense. He said that he was dropping off a friend at Gunn Gardens and driving to pick up a log truck at a friend's property on the night in question. According to Defendant, he pulled up to a stop sign, and the car behind him "tooted" its horn. At the next stop sign, the driver in the car behind him "laid on the horn" even though he had only been stopped there for a few seconds. Defendant testified that he thought he recognized Mrs. Barnett's car as one that he had seen at a local church where there had been drug activity. Therefore, he stopped, took a picture of Mrs. Barnett's car, and sent it to a law enforcement officer.

Defendant generally disagreed with Mrs. Barnett's version of events regarding the drive that led to her home. He stated that he was driving that direction not to follow her home, but because he was traveling to a property that was just beyond Mrs. Barnett's property and that was the fastest route. However, after the incident was over, Defendant did not go to the property or get the log truck. He stated that he decided to go home to make sure his own property was safe in light of the altercation. When asked why he took his shirt off after stopping at Mrs. Barnett's house, he said, "I was a little irritated but not hot enough to fight." According to Defendant, the Barnetts made him fearful that evening.

Defendant called Reverend Darren Graves to testify on his behalf. Reverend Graves confirmed that there had been suspicious activity in his church's parking lot and that he understood why Defendant would have been suspicious of Mrs. Barnett's vehicle. On cross-examination, however, Reverend Graves admitted that none of the suspicious activity he described had been linked to Mrs. Barnett.

- 5 -

On rebuttal, the State called Lieutenant Steven Whitlock of the Criminal Investigations Division of the Decatur County Sheriff's Office. Lieutenant Whitlock testified that he received a text message from Defendant on the night of the incident regarding a car Defendant believed to be selling drugs. When asked what he did with this information, Lieutenant Whitlock said that he deleted the text message. According to Lieutenant Whitlock, this was not the first time he had received texts like this from Defendant. He eventually began to disregard these texts and information from Defendant as unreliable because the lieutenant was not able to substantiate Defendant's assertions.

The jury convicted Defendant as charged of two counts of assault and one count of reckless endangerment with a deadly weapon. The trial court sentenced Defendant to eleven months and twenty-nine days confinement on each of the assault convictions, to be served concurrently with each other and with his sentence for reckless endangerment with a deadly weapon. On the reckless endangerment conviction, the court sentenced Defendant to two years of confinement to be served at a rate of at least thirty percent.[2] Defendant subsequently filed a motion for a new trial or judgment of acquittal, which the trial court denied.[3] Defendant then filed a notice of appeal.

## II.    LAW AND ANALYSIS

On appeal, Defendant asserts that the trial court erred in finding that the evidence was sufficient to support his convictions for reckless endangerment with a deadly weapon and assault. The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); *see also* Tenn. R. App. P. 13(c). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence

---

[2] Defendant does not challenge his sentences on appeal.

[3] Defendant's pleading was styled as a "Motion for New Trial or Directed Verdict." However, as the trial court noted in its order denying the motion, Tennessee Rule of Criminal Procedure 29(a) abolished motions for directed verdicts and replaced them with motions for judgment of acquittal. Therefore, this court, like the trial court, refers to Defendant's motion as one for a new trial or judgment of acquittal.

is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id*. at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017), *abrogated on other grounds as recognized in State v. Beaty*, No. M2014-00130-CCA-R3-CD, 2016 WL 3752968, at *20 (Tenn. Crim. App. July 8, 2018), *perm. app. denied* (Tenn. Jan. 10, 2017).

## A. Reckless Endangerment with a Deadly Weapon

Specific to his conviction for reckless endangerment with a deadly weapon, Defendant argues that the State did not establish that crime because he used his vehicle for its intended purposes that night—not as a weapon. To find Defendant guilty of the crime of reckless endangerment, the State was required to prove that Defendant "recklessly engage[d] in conduct that place[d] or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). If committed with a deadly weapon, reckless endangerment becomes a Class E felony. *Id*. at (b)(2). Specific to reckless endangerment, a motor vehicle can constitute a deadly weapon for reckless endangerment. *State v. Wilson*, 211 S.W.3d 714, 719 (Tenn. 2007) (citing *State v. Tate*, 912 S.W.2d 785, 787 (Tenn. 1995)).

Within the meaning of the foregoing statute:

"Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).

When viewed in the light most favorable to the State, the evidence presented at trial is sufficient to find Defendant guilty of reckless endangerment with a deadly weapon. The

- 7 -

jury was free to conclude from Mrs. Barnett's testimony that Defendant acted recklessly when he tailgated her from her place of work to her home—at unsafe speeds and following so closely that she was afraid for her life. As Mrs. Barnett increased her speed to escape, Defendant accelerated. According to Mrs. Barnett, if she needed to apply her car's brakes, Defendant would have struck her with his vehicle. This placed her in imminent danger of death or serious bodily injury. The precarious conditions of the roadways increased this risk. In light of the evidence presented at trial, a jury could have found beyond a reasonable doubt that Defendant's conduct showed he was aware but consciously disregarded that his driving placed Mrs. Barnett in imminent danger of death or serious bodily injury, and that this constituted a substantial and unjustifiable risk to her safety. Accordingly, he is not entitled to relief on this issue.

## B. Assault

Defendant also challenges the sufficiency of the evidence to support his two assault convictions. As is relevant to this case, "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). We conclude there is sufficient evidence in the record for a jury to conclude that Mr. and Mrs. Barnett reasonably feared imminent bodily injury. On her drive home, Mrs. Barnett was "scared to death" and "frantic" as she attempted to escape Defendant. She repeatedly attempted to call 911 and Mr. Barnett to elicit help. She described in detail the reasons for which she was afraid of being tailgated on the narrow and winding roads driving home. After he got out of his car, Defendant took off his shirt and threatened Mrs. Barnett, saying he would "beat the sh** out of" her. Defendant also appeared to be searching for a weapon in his vehicle.

For similar reasons, a rational jury could have found Defendant guilty beyond a reasonable doubt of assaulting Mr. Barnett as he attempted to aid Mrs. Barnett and to defuse the situation near the road. Mr. Barnett came and stood between Defendant and Mrs. Barnett even though he feared for his own life. The shirtless Defendant was "dancing" around in the street because he was angry and threatened Mr. and Mrs. Barnett when he said would "whoop both of y'all right now."

Defendant maintains on appeal that the aggressors in the situation were the Barnetts. Further, he contends that he never actually entered onto the victims' property. Whether he entered onto the Barnetts' property is irrelevant to whether he is guilty of the assaults, and the jury heard Defendant's testimony and was free to discredit his version of events. In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *Bland*, 958 S.W.2d at 659; *State v. Pruett*, 788 S.W.2d at

410. The jury's verdicts reflect that it credited the testimony of Mr. and Mrs. Barnett and discredited Defendant's testimony. Defendant is not entitled to relief on this issue.

## III. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
